[No. H004243. Sixth Dist. Aug. 16, 1990.]

DOROTHY DEL MAR, Plaintiff and Appellant, v.
DENNIS G. CASPE, as Executor, etc., Defendant and Appellant.

1318

COUNSEL

Robert C. Landry for Plaintiff and Appellant.

Wyckoff, Richardson, Sanson, Allen & Locke-Paddon, Robert K. Johnson and James A. Kerr for Defendant and Appellant.

OPINION

## CAPACCIOLI, J.—

### Statement of the Case

Plaintiff Dorothy Del Mar filed an action against defendant Dennis G. Caspe as executor of the estate of decedent Ole Mohus, seeking treble the amount of allegedly usurious interest she paid to the estate on three promissory notes. She now appeals from a judgment entered after the trial court found that the notes were not usurious. On appeal, she claims the notes were usurious.

Defendant cross-appeals from a postjudgment order denying his motion for an award of attorney's fees based on fee provisions in the notes. (Code Civ. Proc., § 904.1, subd. (b).)

We conclude that one of the notes was usurious. We further conclude that it was error to deny fees on the ground the action did not involve the notes. Consequently, we reverse the judgment and remand the matter for further proceedings.

### Facts

The facts are essentially undisputed.

Mohus and Del Mar had been personal friends since 1954. At various times from 1975 to 1986, Mohus loaned her money.

In 1982, Mohus retained Caspe, a licensed attorney and real estate broker. He told Caspe about the loans to Del Mar and explained that periodically he would have a new promissory note and deed of trust drawn up and executed. At that time, he presented Caspe with various checks from Del Mar and asked him to figure out the current amount due, calculate the interest on advances, and prepare a new note and deed of trust. Caspe also

checked for prior encumbrances on Del Mar's real property and discovered that Mohus had a second deed of trust.

Caspe calculated the balance due of $37,430.84, and prepared the note. It provided a 15 percent interest rate, which, based upon information from lender quotations and industry publications, he determined to be below the market rate for second deeds of trust. The note was payable on August 1, 1982, or upon the sale of Del Mar's residence, the real property securing the note, and it "replace[d] all prior notes between the parties." On March 19, 1982, Mohus, Caspe, and Del Mar met, and Del Mar executed the note.

Between April and August 1982, Mohus made numerous advances to Del Mar, and in September, Mohus instructed Caspe to prepare a new note and trust deed reflecting the advances. Caspe did as he had done before. The new note was for $42,430.84, provided for 15 percent interest, came due on August 1, 1983, or upon sale of Del Mar's residence, and superseded all previous notes. On September 10, 1982, Del Mar executed this note.

Thereafter, at various times until January 1986, Mohus advanced Del Mar additional sums. In January, Caspe had several conversations with Mohus and Del Mar about a new note. Del Mar expected an interest rate of 12 percent, whereas Mohus expected the same 15 percent he had previously received. Caspe negotiated between them, and they eventually agreed to a rate of 13 percent, which was below the market rate. Caspe then prepared the note, including the advances. It was for $80,933.21, provided for 13 percent interest, came due on April 30, 1986, or upon the sale of Del Mar's residence, and superseded all previous notes. Del Mar executed this note on January 30, 1986.

Mohus died before this last note came due. On May 2, 1986, Caspe, executor of Mohus's estate, wrote Del Mar and demanded payment plus interest. Del Mar paid the note in full "under extreme protest."

At all relevant times, Caspe was an attorney licensed to practice in California. Caspe was also a licensed real estate broker from October 1977 to October 1985, and from June 1986 to the date of trial.

## DISCUSSION

### The Appeal

Del Mar contends that the trial court erred in concluding that because the three notes were "made or arranged" by a licensed real estate broker

and/or licensed attorney, they were exempt from the constitutional prohibition against usury. (See Cal. Const., art. XV.)

## The Law

Article XV of the California Constitution (hereafter article XV) provides, among other things, that the maximum allowable rate of interest that may be charged on a loan for "personal, family, or household purposes" is 10 percent per year.[1] (Cal. Const., art. XV, § 1, subd. (1).)

In 1979, the Legislature proposed and the electorate enacted Proposition 2, an amendment to article XV. Among other things, Proposition 2 exempted from the interest rate ceiling "any loans made or arranged by any person licensed as a real estate broker by the State of California and secured in whole or in part by liens on real property." (Assem. Const. Amend. No. 52 (Stats. 1979 (Reg. Sess.) res. ch. 49, pp. 4860-4862.).)

In 1983, the Legislature sought to explain the scope of article XV by adding section 1916.1 to the Civil Code (hereafter section 1916.1). (Stats. 1983, ch. 307, § 1, p. 899.) As amended in 1985 (Stats. 1985, ch. 489, § 1, pp. 1837-1838), section 1916.1 provides in relevant part, "The restrictions upon rates of interest contained in Section 1 of Article XV of the California Constitution shall not apply to any loan or forbearance made or arranged by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property. For purposes of this section, a loan or forbearance is arranged by a person licensed as a real estate broker when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another . . . . ■■ ■■ The term 'made or arranged' includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license."[2]

## The Trial Court's Findings

In its statement of decision, the trial court found that Caspe "did make and arrange" all three loans from Mohus to Del Mar.

---

[1] Article XV provides in relevant part, "The rate of interest upon the loan or forbearance of any money, . . . shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, . . . to contract in writing for a rate of interest: [¶](1) For any loan or forbearance of any money, . . . for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum; . . ."

Neither party contends that the loans from Mohus to Del Mar were not for "personal, family, or household purposes."

[2] It is settled that section 1916.1 is retroactive to loans made before the date of its enactment and amendment. (*Stickel* v. *Harris* (1987) 196 Cal.App.3d 575, 582, fn. 5 [242 Cal.Rptr. 88], and cases cited there.)

The trial court based this finding on the following facts: "(1) Caspe conducted an informal title search by obtaining recorded encumbrances against the Plaintiff's property. [¶](2) Caspe reviewed the recorded encumbrances and prior notes and deeds of trust executed by Plaintiff to determine their effect on subject transaction. [¶](3) Caspe consulted with the lender, Ole Mohus, and advised the lender, Ole Mohus, of his rights and obligations as well as the potential problem areas of the subject transaction. [¶]4. Caspe reviewed the advance clauses contained in the deeds of trust and discussed the effect of the advance clauses with the lender, Ole Mohus, and cautioned the lender, Ole Mohus, about the legal consequences of making advances without a prior signed promissory note. [¶]5. Caspe reviewed the checks and other documents evidencing advances made by the lender, Ole Mohus, to the borrower, Plaintiff. [¶]6. Caspe calculated the principal amount of the prior loan and the principal amount of future advances. [¶]7. Caspe calculated interest on the prior principal amount and calculated interest on future advances. [¶]8. Caspe calculated the amount of the new note by totalling the prior principal plus interest on principal plus the amount of the new advances plus interest on the new advances. [¶]9. Caspe prepared three promissory notes and two deeds of trust. Caspe secured the January, 1986 note by the January, 1982 deed of trust. [¶]10. Caspe discussed the terms of the new notes and deeds of trust with the lender, Ole Mohus, and advised lender how calculation was made. [¶]11. Caspe discussed terms of new notes and deeds of trust with borrower (Plaintiff) and advised borrower how principal and interest on notes was calculated. [¶]12. Caspe obtained borrower's signature on new notes and deeds of trust. [¶]13. Caspe notarized deeds of trust. [¶]14. Caspe caused deeds of trust to be recorded. [¶]15. Caspe negotiated interest on January, 1986 loan with borrower and lender. [¶]16. Caspe calculated and collected payoff of January, 1986 note (i.e., calculated amount of principal and interest due for payoff of January, 1986 note and made demand on escrow holder). [¶]17. Caspe charged a fee for his services in making and arranging the loans."

Del Mar does not claim that these preliminary factual findings are not supported by substantial evidence. Rather, she challenges the court's conclusion that these acts constitute "making" or "arranging" a loan within the meaning of article XV and section 1916.1. She argues that they are insufficient as a matter of law.

### The Standard of Review

"In usury cases the trier of fact is vested with the power to resolve many issues attending and including the ultimate question of whether a particular transaction is usurious." (*Stickel* v. *Harris, supra,* 196 Cal.App.3d 575, 584.) This power includes the determination as to whether

a particular loan was "made or arranged" by a licensed real estate broker. (*Ibid.*) Our task on appeal is merely to view all factual matters in favor of the prevailing party and in support of the judgment, disregarding evidence to the contrary, and decide whether there is any substantial evidence, contradicted or uncontradicted, to support the findings and conclusions of the trier of fact. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384]; *Stickel* v. *Harris, supra*, 196 Cal.App.3d 575, 584; *Louis & Diederich, Inc.* v. *Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584 [234 Cal.Rptr. 889].)

*The Meaning of "Made or Arranged"*

■ In this case, we agree with Del Mar that the evidence of Caspe's conduct as a matter of law does not establish that he "made" the loans in question. This is so because a loan is "made" by a licensed real estate broker within the meaning of article XV and section 1916.1 "when the broker acts as a principal in the transaction by lending his own money." (*Winnett* v. *Roberts* (1986) 179 Cal.App.3d 909, 917 [225 Cal.Rptr. 82]; see *Green* v. *Future Two* (1986) 179 Cal.App.3d 738, 742 [225 Cal.Rptr. 3]; *Orden* v. *Crawshaw Mortgage & Investment Co.* (1980) 109 Cal.App.3d 141, 144-145 [167 Cal.Rptr. 62].) It is undisputed that Caspe was not a principal in the loans made to Del Mar and did not lend his own money.

■ Thus, the issue is whether the trial court's factual findings support its conclusion that Capse "arranged" the loans.

"Courts and commentators have observed that the meaning of 'arranged' is unclear. Standing alone and without explication, 'arranged' fails to convey precisely what activities on the part of a licensed real estate broker constitute arrangement of a loan. [Citations.] Like many other words in common usage [citations], 'arranged' is a term of amorphous dimensions." (*Winnett* v. *Roberts, supra*, 179 Cal.App.3d 909, 917-918.) Under the circumstances, therefore, we may look to the legislative history and intent of the exemption for help in determining the meaning of its terms. (*Id.* at p. 918.) To this end, we consider the ballot summary, arguments, and analysis for Proposition 2 presented to the electorate and the findings made by the Legislature in enacting section 1916.1. (*Id.* at pp. 918-920.)

The ballot pamphlet analysis by the legislative analyst accompanying Proposition 2 states: "The Constitution specifically exempts the following lenders from the usury law: savings and loan associations, state and national banks, industrial loan companies, credit unions, pawnbrokers, personal property brokers and agricultural cooperatives." However, "loans made or

arranged by any person licensed as a real estate broker by the State of California and secured in whole or in part by liens on real property are subject to a 10 percent interest rate ceiling. Such loans are commonly made by mortgage brokers and mortgage bankers. Under this measure such loans would be exempt from the constitutional limitations on interest rates that may be charged." (Ballot Pamp., Special Statewide Elec. (Nov. 6, 1979) p. 10.)

The argument in favor of Proposition 2 explained that current usury law, "limited the price which many lenders could charge for the use of money to 10 percent. Unfortunately, inflation and other factors have made that limit unrealistic. [¶]Because 10 percent is not enough today, many lenders no longer loan money in California (although others who are *now* exempt from the Usury Law still do). For example, mortgage bankers, who last year provided $13 billion for housing loans in California, are limited to a 10 percent rate and in 1979 have practically abandoned providing conventional mortgage loans. [¶]This *shortage* of money is curtailing the building of new homes, apartments, stores, and factories to provide needed new jobs. Because this reduces competition among lenders, it actually forces interest rates *up* on money from lenders now exempt from the Usury Law. [¶]Now, it might *seem* good to be able to have a law which limited the price of a loaf of bread to 10 cents; but, if we had such a law, there would be no bread or only black market bread. We are approaching that stage on the availability of *extra* money—for a family to buy a home, an employer to buy a new factory, tools, a store, or some other job-creating opportunity. [¶]Proposition 2 deals with that problem in realistic and *controlled* circumstances. [¶]It is complex and technical because both the law and the money market are complex and technical. Proposition 2 is explained in the Legislative Analyst's analysis in this pamphlet with text of the changes. [¶]An important fact is that this constitutional provision *retains* present provisions enabling a control by law on 'the maximum rate per annum' and on fees or other compensation—a vital control against abuse. Proposition 2 removes the arbitrary, inflexible, and unrealistic *constitutional* limits on nonconsumer loans and on exemptions which have severely limited the flow of money to California to buy homes, create job opportunities, and for other purposes." (Ballot Pamp., *supra*, at p. 12, italics in original.)

We turn now to section 1916.1. In its uncodified provisions, the Legislature declared "that the Legislature in adopting ACA 52 in 1979 . . . , and the people in approving that measure as Proposition 2 . . . , established an additional class exempt from interest rate limitations for persons licensed as real estate brokers by the State of California on the basis that real estate brokers are qualified by the state on the basis of education, experience, and examination, and that the licenses of real estate brokers can be revoked or

suspended if real estate brokers perform acts involving dishonesty, fraud, or deceit with intent to substantially benefit themselves or others, or to substantially injure others." (Stats. 1983, ch. 307, § 2, p. 899.)[3]

██ The Legislature's interpretation of article XV is not unreasonable. Thus, we accept it as controlling. (*Winnett* v. *Robert, supra*, 179 Cal.App.3d 909, 921 [225 Cal.Rptr. 82]; *Garcia* v. *Wetzel* (1984) 159 Cal.App.3d 1093, 1097 [206 Cal.Rptr. 251]; *In re Lara* (9th Cir. 1984) 731 F.2d 1455, 1459; see *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692-694 [97 Cal.Rptr. 1, 488 P.2d 161].)

To summarize, it appears the electorate considered the real estate broker exemption necessary to increase the availability of money for nonconsumer loans and essential to the future economic well-being of California and its citizens. ██ The electorate and Legislature further considered the licensing requirements for and regulatory control over real estate brokers sufficient to protect the borrowing public from usury and dishonest real estate brokers.[4]

██ The foregoing background suggests that a broad rather than narrow construction of the exemption is appropriate and most apt to realize its purpose.

The provisions of section 1916.1, as written and construed, tend to support this view.

For example, under this section, the exemption for *making* a loan applies even if the broker is not acting in a licensed capacity as when the broker is

---

[3] We note that to obtain a real estate brokers license, an applicant must have two years previous experience as a licensed real estate salesman, or equivalent general experience in real estate, or a four-year college degree that includes a specialization in real estate. (Bus. & Prof. Code, § 10150.6.) The Real Estate Commissioner is authorized to require proof and to call hearings concerning the honesty and truthfulness of applicants. (*Id.*, § 10152.) Applicants must pass a written examination that tests knowledge of real estate law, the canons of ethics related to real estate practice, and the regulations of the Real Estate Commissioner. (*Id.*, § 10153.) Finally, an applicant must provide evidence of having satisfied certain educational requirements. (*Id.*, §§ 10153.2-10153.3.)

After one becomes a broker, his or her license may be suspended or revoked not only for the wrongful or negligent performance of licensed activities, but also for violations of the Franchise Investment Law (Corp. Code, § 31000 et seq.), fraudulent or dishonest dealings, or conviction for a crime involving moral turpitude, regardless of whether the broker was acting in a licensed capacity at the time. (Bus. & Prof. Code, § 10177, subds. (b), (j), (m).)

[4] Usury laws are designed to protect the public from sharp operators who would take advantage of "unwary and necessitous borrowers." (*Buck* v. *Dahlgren* (1972) 23 Cal.App.3d 779, 787 [100 Cal.Rptr. 462]; *White* v. *Seitzman* (1964) 230 Cal.App.2d 756, 761 [41 Cal.Rptr. 359, 16 A.L.R.3d 500]; *Wooton* v. *Coerber* (1963) 213 Cal.App.2d 142, 148 [28 Cal.Rptr. 635].)

lending his or her own money. (*Stickel* v. *Harris, supra,* 196 Cal.App.3d 575, 583, fn. 7.) Thus, a loan by a broker at 250 percent interest was held exempt from the interest rate ceiling. (*Garcia* v. *Wetzel, supra,* 159 Cal.App.3d 1093, 1097-1098; see also *In re Lara, supra,* 731 F.2d 1455, 1458-1462 [loan by broker at over 15 percent interest exempt].) Presumably, the regulatory control over t 'kers is considered sufficient to deter and protect against the evils of usury and fraudulent, dishonest, or unfair practices by the lending broker. (But see *Garcia* v. *Wetzel, supra,* 159 Cal.App.3d 1093, 1098-1100 (dis. opn. of White, P. J.); Comment, *The Usury Exemption: Should It Apply to Real Estate Brokers Making Loans?* (1986) 26 Santa Clara L. Rev. 403.)

We further observe that the exemption for "arranging" a loan applies if the licensed broker "acts for compensation or in expectation of compensation for *soliciting, negotiating, or arranging* the loan for another[.]" (§ 1916.1, italics added.)

In enumerating soliciting, negotiating, and arranging, the Legislature recognized the broad range of services that a broker may perform that would render the exemption applicable. Significantly, it also distinguished the acts of soliciting, negotiating, and arranging from each other. Thus, although these functions may overlap, listing them in the disjunctive clearly indicates an intent that the exemption apply when the broker performs *any* one of these services.[5]

Finally, we note that section 1916.1 does not require or indicate that the exemption applies only if the broker is somehow involved in determining the interest rate to be charged on a loan that he or she has solicited, negotiated, or arranged. Moreover, there is nothing implicit in the common understanding of these terms that would compel such a view. (See *Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 824 [125 Cal.Rptr. 348] [court should not find hidden meanings to statutory terms].)

---

[5] In 4 Miller and Starr, California Real Estate (2d ed. 1989) section 10:28, page 766, the authors opine that the exemption for "arranging" a loan should apply only upon proof that the lender was the " 'procuring cause' for the loan." They suggest "that a broker who has 'arranged' a loan is one who has (1) introduced the parties to each other; (2) assisted the borrower in the preparation of the loan application and supporting documentation; (3) negotiated the terms of the loan, not only as to term and interest, but also as to the other negotiable terms; and (4) received compensation for such services." (*Ibid.*)

Obviously, proof of all four circumstances would be sufficient to establish that a broker "arranged" a loan. However, neither section 1916.1 nor the relevant case law, which we will discuss, suggests that proof of *all* four is or should be required to establish that a loan has been "arranged" by a real estate broker. (See *Jones* v. *Kallman* (1988) 199 Cal.App.3d 131 [244 Cal.Rptr. 609]; *Green* v. *Future Two, supra,* 179 Cal.App.3d 738; *Chapman* v. *Farr* (1982) 132 Cal.App.3d 1021 [183 Cal.Rptr. 606]; *In re Lara, supra,* 731 F.2d 1455.)

The relevant case law is consistent with our view that the terms of the exemption should be given a broad construction so as to effect its purpose.

In *In re Lara, supra,* 731 F.2d 1455, 1462-1463, the broker agreed to loan a certain sum on the condition that the borrowers permit the broker's friend to lend them half of the funds. The court opined that merely bringing the friend into the transaction constituted solicitation within the meaning of section 1916.1.

In *Chapman* v. *Farr, supra,* 132 Cal.App.3d 1021, the exemption was applicable because the broker "structured" the transaction "as agent" for his parents. (*Id.* at p. 1026.)

In *Jones* v. *Kallman, supra,* 199 Cal.App.3d 131, the exemption applied where, " 'at the lender's request,' " the broker determined the interest rate and points to be charged on the loan and similarly set the terms of the forbearance and reviewed the loan and forbearance documents, which were prepared by another nonlicensed person. (*Id.* at p. 135.)

■■■ It is a settled rule of statutory construction that unless otherwise clearly intended or indicated, statutes should be construed in accordance with the common or ordinary meaning of the language used, particularly when the law as so construed is consistent with the general policy of the state. (*Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 203 [339 P.2d 801], disapproved on other grounds in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88* (1960) 53 Cal.2d 455, 473-475 [2 Cal.Rptr. 470, 349 P.2d 76]; *Estate of Richartz* (1955) 45 Cal.2d 292, 294 [288 P.2d 857].) In essence, we assume the Legislature "knew what it was saying and meant what it said." (*Pac. Gas & E. Co.* v. *Shasta Dam etc. Dist.* (1955) 135 Cal.App.2d 463, 468 [287 P.2d 841].) We believe it appropriate to apply this rule here.

■■■ The common and ordinary meaning of the word "arrange" includes: "to put in correct, convenient, or desired order"; to put in order beforehand: make preparations for"; to effect [usually] by consulting: come to an agreement or understanding about: settle." (Webster's New Internat. Dict. (3d ed. 1981) p. 120.)

Turning to the facts of this case, and given the exemption's legislative history and purpose, the language of section 1916.1, and the common meaning of "arrange," we conclude that the services Caspe performed for compensation (title searches, document reviews, consultation and advisement, calculation of principal and interest, preparation of loan documents, discussion of documents and terms with lender and borrower, securing execution of documents) reasonably fall within the common understanding of the

term "arrange" and "arranging a loan." His services were not nominal or ostensibly pretextual. Nor is there evidence that Caspe merely lent his license to Mohus to avoid the 10 percent interest limitation. Rather, Caspe was essential to preparation, execution, and completion of the loan documents and transaction.

In sum, therefore, we hold that substantial evidence supports the trial court's finding that Caspe "arranged" Mohus loans to Del Mar.

Del Mar argues that if "the consolidation of previous loans and advances into one current note were to constitute 'arranging' . . . , it would amount to an easy way to evade the usury laws by simply having a broker draw the new consolidation note with otherwise usurious interest." We are unpersuaded.

 " 'One who contends that a provision of an act must not be applied according to the natural or customary purport of its language must show either that some other section of the act expands or restricts its meaning, that the provision itself is repugnant to the general purview of the act, or that the act considered in pari materia with other acts, or with the legislative history of the subject matter, imports a different meaning.' " (*Leroy T. v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665], quoting 2A Sands, Statutes & Statutory Construction (4th ed. of Sutherland, Statutory Construction, 1973) § 46.01, p. 49.)

 Del Mar has never claimed that the promissory notes in issue do not represent loans secured by real property and that their execution constituted loan transactions between Mohus and Del Mar. The fact that Caspe did not solicit or negotiate the loans and that they represented consolidation of previous loans and advances is, in our view, irrelevant to the question of whether the services Caspe did perform for compensation constituted sufficient involvement in these transactions to come within the meaning of the term "arrange." As discussed above, we believe they do.

Moreover, in rendering his services to Mohus, Caspe needed a license and was acting in a licensed capacity. (See Bus. & Prof. Code, § 10131, subd. (d); see also *Stickel* v. *Harris, supra,* 196 Cal.App.3d 575, 583.) And his status as a licensed broker rendered him vulnerable to scrutiny and potential sanction by the Real Estate Commissioner if he acted fraudulently or dishonestly.

Consequently, Del Mar has failed to convince us that Caspe's conduct is not within the common and ordinary meaning of the word "arrange" or that a narrower, more technical definition of the word is necessary.

### *Caspe's Status as a Licensed Attorney*

■ Del Mar contends that since Caspe was not a licensed real estate broker when he prepared the 1986 note, that note was not exempt from the constitutional interest rate ceiling. We agree.

In its statement of decision, the trial court concluded that even though Caspe lacked a broker's license when he "arranged" the 1986 note, he nevertheless was exempt. The court noted that the Constitution exempts, inter alia, real estate brokers and "any other class of persons authorized by statute." (Cal. Const., art. XV.) It also pointed out that Business and Professions Code, sections 10133 and 10133.1 authorize an attorney acting for a client to perform acts for which a real estate broker's license would otherwise be required.[6] (See § 10131.)

The court reasoned that since Caspe was a licensed attorney when he arranged the 1986 note, he "substantially complied" with the real estate brokers' licensing requirements and, therefore, enjoyed the benefit of the brokers' exemption.

The trial court's analysis is deceptively simple and appealing: since lawyers are authorized to do what brokers do, why should they not also qualify for the usury exemption? There are, however, several reasons.

Initially, we note that article XV explicitly enumerates those who are exempt from the interest rate ceiling. Lawyers are not listed. ■ As a

---

[6]Business and Professions Code, section 10131, subdivision (d) provides: "A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: [¶](d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity."

Business and Professions Code, section 10133, subdivision (a)(3) provides, "The acts described in Section 10131 are not acts for which a real estate license is required if performed by: [¶](3) An attorney at law in rendering legal services to a client."

Business and Professions Code, section 10133.1, subdivision (a)(5) provides, in relevant part, "Subdivisions (d) and (e) of Section 10131 . . . do not apply to any of the following: [¶](5) Any person licensed to practice law in this state, not actively and principally engaged in the business of negotiating loans secured by real property, when that person renders services in the course of his or her practice as an attorney at law, and the disbursements of that person, whether paid by the borrower or other person, are not charges or costs and expenses regulated by or subject to the limitations of Article . . . , provided, the fees and disbursements shall not be shared, directly or indirectly, with the person negotiating the loan or the lender."

Unless otherwise specified, all further statutory references are to the Business and Professions Code.

general rule, where exceptions to a general rule are specified, other exceptions are not to be implied or presumed. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].)

In addition, since 1979, article XV has authorized the Legislature to create other statutory exemptions from the interest rate ceiling. As yet, however, the Legislature has not explicitly decided to create an exemption for lawyers.

Despite the Legislature's inaction, the trial court purported to establish such an exemption, by finding it implicit in the Business and Professions Code.

First, it does not follow that because sections 10133 and 10133.1 exempt licensed attorneys working for clients from the statutory brokers license requirements, they also necessarily exempt licensed attorneys from the totally unrelated constitutional prohibition against usury. Such an additional exemption is not naturally or reasonably suggested by the language of these statutes. And we have found no legislative history indicating that the Legislature intended the former exemption to include the latter. Indeed, the very explicitness of the existing constitutional exemptions militates against finding usury exemptions buried implicit in unrelated provisions of the Business and Professions Code.

Moreover, if the lawyers exemption from the statutory brokers license requirement also constituted an exemption from the constitutional interest rate ceiling, then it could be argued that an exemption should also be implied for the others, besides lawyers, who are listed in sections 10133 and 10133.1 and exempted from the brokers license requirement. These others include, inter alia, "A regular officer of a corporation or a general partner of a partnership" (§ 10133, subd. (a)(1)); "A person holding a duly executed power of attorney" (§ 10133, subd. (a)(2)); "A receiver, trustee in bankruptcy or other person acting under order of a court of competent jurisdiction" (§ 10133, subd. (a)(4)); "A trustee for the beneficiary of a deed of trust" (§ 10133, subd. (a)(5)); "Any person or employee thereof doing business under any law of this state, any other state, or of the United States relating to banks, trust companies, savings and loan associations, industrial loan companies, pension trusts, credit unions, or insurance companies" (§ 10133.1, subd. (a)(1)); any person licensed as a "consumer finance lender, or a commercial finance lender when acting under the authority of that license" (§ 10133.1, subd. (a)(6)); "Any cemetery authority . . . authorized to do business in this state" (§ 10133.1, subd. (a)(7)); "Any person authorized in writing by a savings institution to act as an agent of that institution, . . . when acting under the authority of such written authorization"

(§ 10133.1, subd. (a)(8)); or "Any person who is licensed as a securities broker or securities dealer under any law of this state, or of the United States, or any employee, officer, or agent of that person, if that person, employee, officer, or agent is acting within the scope of authority granted by that license" (§ 10133.1, subd. (a)(9)); "Any lender making a loan guaranteed or insured by an agency of the federal government" (§ 10133.1, former subd. (b)).

We are extremely hesitant to open the door for such a potential flood of exempt classes.

We recognize that sections 10133 and 10133.1 exempt several types of lenders from the brokers license requirement and that some of these lenders are also explicitly exempted in article XV from the interest rate ceiling, e.g., personal property brokers, certain types of banks, and certain types of corporations. This limited overlap, however, suggests that those not separately and expressly listed in both places do not enjoy both exemptions.

We also observe that those exempted in article XV are generally in the business of lending or mortgage brokering. Their exemptions, in view of the purpose of the real estate broker's exemption, may be understood as being a means to increase the amount of funds available for lending and keep down the cost of borrowing.

On the other hand, the list of classes exempt from the brokers license requirement does not focus on lenders or mortgage brokers but rather on those who may have occasion and need to deal with their own or a client's real property, which, of course, would include some lenders, but also includes, for example, cemeteries and those holding powers of attorney. Given the difference in focus and purpose between the two kinds of exemptions, we find it difficult, indeed impossible, to infer that in creating exemptions from the brokers license requirements, the Legislature intended to exercise its authority, under article XV, to create exemptions from the interest rate ceiling.

It could be argued that while it may not be appropriate for all of those exempted from the brokers license requirement to enjoy a usury exemption, a lawyers' exemption is appropriate because lawyers, like real estate brokers, possess expertise and are subject to regulation and disciplinary action.

There is nothing in sections 10133 and 10133.1 suggesting that lawyers are to be treated differently from others on the list of exempt classes. Consequently, the only reason to single out lawyers for special treatment would be that we consider it wise, appropriate, and safe for lawyers to enjoy the same

usury exemption as do real estate brokers. Such a conclusion is, however, unmistakably legislative in nature and, therefore, beyond the proper and appropriate exercise of our judicial function and power.

 We acknowledge that although courts may not read into a statute an exception not incorporated therein by the Legislature, they may find implied exceptions where it is reasonable and *necessary* to do so to avoid disregarding or overturning a sound rule of public policy (*Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 235 [104 Cal.Rptr. 558]) or to avoid absurd and manifestly unjust consequences (*Ex parte Lorenzen* (1900) 128 Cal. 431, 439 [61 P. 68]).

 Here, however, we believe the creation of a lawyers exemption is a matter for the Legislature.

In light of our discussion, we hold that the exemptions from brokers licensing requirements for attorneys in sections 10133 and 10133.1 do not also exempt lawyers from the constitutional limitations on interest rates.

 We next turn to the trial court's finding that Caspe substantially complied with the real estate brokers licensing requirements and, therefore, was exempt.

As Caspe notes, the concept of substantial compliance with the real estate brokers licensing requirements is set forth in case law developed under section 10136. This section, however, simply provides that to maintain an action *for compensation* for brokerage services rendered, a broker must allege and prove that he or she was a licensed broker at the time the cause of action arose.

This case does not involve an action for compensation. Moreover, it is unclear whether the concept of substantial compliance should apply to defeat the constitutional command of article XV.

We need not decide this issue because the evidence does not support a finding that Caspe substantially complied with the licensing statute.

Caspe was not a licensed broker when he discussed and prepared the 1986 note. He was not a licensed broker when the note was executed on January 30, 1986. He was not a broker when Mohus died sometime in April 1986. He was not a broker when the note came due on April 30, 1986. And he was not a broker when he wrote Del Mar on May 2, 1986, demanding that the note be paid. Only later, in June 1986, did Caspe reobtain his broker's license.

These undisputed facts indicate *no* compliance with the licensing statute. Indeed, had Caspe not been a licensed attorney, it is doubtful whether he could have recovered in an action for compensation for the services performed on the 1986 note because he did not have a real estate broker's license either when he performed the services for Mohus or when the cause of action for compensation arose, i.e., after the services were rendered.

Caspe's reliance on *Cline* v. *Yamaga* (1979) 97 Cal.App.3d 239, 246 [158 Cal.Rptr. 598], and *Brenneman* v. *Lane* (1927) 87 Cal.App. 414 [262 P. 400] is misplaced. In *Cline*, the broker was entitled to sue for a commission because he was licensed when he performed the services giving rise to the commission. In *Brenneman*, the broker was entitled to sue for a commission because he had a license when his cause of action for the commission arose. As noted above, Caspe did not have a broker's license when he rendered service to Mohus or even when Del Mar's payment of the note became delinquent and a cause of action thereon arose.

Finally, the fact that at all times Caspe as a licensed attorney was authorized to perform acts without a broker's license does not constitute substantial compliance with the licensing requirement. If it did, then, in effect, licensed attorneys would be exempt from the usury prohibition. As previously discussed, however, we believe the creation of such an exemption is the prerogative of the Legislature.

### Conclusion

In light of our analysis, we conclude that substantial evidence supports the trial court's finding that the March 1982 and September 1982 notes were not usurious. However, substantial evidence does not support such a finding as to the January 1986 note because the note (1) was secured by real property; (2) charged interest in excess of that permitted by article XV; and (3) was not "made or arranged" by a licensed real estate broker.

### THE CROSS-APPEAL

### Attorney's Fees

■ Caspe contends the trial court erred in denying the estate's claim for attorney's fees, which was based on fee provisions in the notes.[7]

In denying Caspe's claim, the trial court stated that "[t]his was not an action on the contract but an action seeking enforcement of constitutional protection against usury."

---

[7] The 1986 note provides, in pertinent part, "If action be instituted on this note I promise to pay such sum as the Court may fix as attorney's fees."

Both 1982 notes contained similar clauses.

In *Winnett* v. *Roberts, supra,* 179 Cal.App.3d 909, the plaintiffs sued to enjoin the foreclosure sale of real property under a trust deed securing a promissory note that called for a 40 percent annual interest rate and that provided, in pertinent part, " 'If action be instituted on this note, I promise to pay such sum as the Court may fix as attorneys' fees.' " (*Id.* at pp. 914, 922.) The trial court issued a temporary restraining order halting the sale, conditioned upon plaintiffs paying the principal within five days. Although plaintiffs paid the principal, the court denied a preliminary injunction, stating that the " 'note is not usurious because it was arranged by a licensed real estate broker and is secured by real property.' " (*Id.* at pp. 914-915) After the foreclosure sale, plaintiffs amended their complaint, seeking to set aside the sale and recover damages on grounds that the note was usurious. On appeal, the court declared that "[a]n attorney fee provision in a promissory note is broad enough to encompass a lawsuit attacking the note as usurious." (*Id.* at p. 923.) Thus, the prevailing party was entitled to fees.

In *Thunderbird Investment Corp.* v. *Rothschild* (1971) 19 Cal.App.3d 820 [97 Cal.Rptr. 112], the plaintiffs brought an action seeking to recover treble the amount of interest paid by them pursuant to the provisions of a promissory note on the ground the note was usurious. The note contained a fee clause similar to that in *Winnett* and those in this case. (*Id.* at p. 830.)

After commencing the action, the plaintiffs paid the entire amount of principal and interest due under the terms of the note, reserving their right to pursue their action for usury. In receiving it, the defendants did not cancel the promissory note but reserved their right to claim attorney's fees for the services of their counsel in defending the usury action. (19 Cal.App.3d at p. 830.)

Under these circumstances, the appellate court stated that the plaintiffs' claim that their payment of the note constituted a usurious exaction "necessarily involved the validity of the provisions of the note relating to interest and the right of [the defendants] to retain the payment of interest which they had received pursuant thereto." (19 Cal.App.3d at p. 830.) Thus, the prevailing party was entitled to fees.

In this case, Del Mar paid the 1986 note *under protest* and immediately filed an action to recover treble the amount of what she considered usurious interest she had paid. As in *Winnett* and *Thunderbird*, the resolution of her claim necessarily involved a determination concerning the validity of the interest provisions in the 1986 note and its predecessors.

In light of *Winnett* and *Thunderbird*, we conclude that the fee provision was broad enough to support an award of fees in this action, and the trial court erred in concluding otherwise.

We note with interest that in her complaint, Del Mar sought attorney's fees under the clauses in the notes. Thus, she believed her action sufficiently involved the validity of the notes to trigger application of their fee provisions.

In reversing her position, Del Mar now relies on *Stout* v. *Turney* (1978) 22 Cal.3d 718 [150 Cal.Rptr. 637, 586 P.2d 1228], *McKenzie* v. *Kaiser-Aetna* (1976) 55 Cal.App.3d 84 [127 Cal.Rptr. 275], and *Geffen* v. *Moss* (1975) 53 Cal.App.3d 215 [125 Cal. Rptr. 687]. These cases, however, are factually and legally distinguishable from this case and do not discuss or consider the more pertinent holdings in *Thunderbird Investment Corp.* v. *Rothschild, supra,* 19 Cal.App.3d 820 or *Winnett* v. *Roberts, supra,* 179 Cal.App.3d 909. Moreover, we are unpersuaded by Del Mar's efforts to distinguish this case from *Winnett* and *Thunderbird* due to differences between the nature of those actions and this. Such differences are immaterial given the fact that each case required a determination of the validity of terms in a note containing a fee clause.

### Disposition

The judgment is reversed and the matter remanded for further proceedings consistent with the conclusions reached in this opinion. The parties are to bear their own costs on appeal.

Agliano, P. J., and Bamattre-Manoukian, J., concurred.