Filed 12/15/25  Williams v. Chisick CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ARN F. WILLIAMS, as Trustee, etc., | |
| Plaintiff, Cross-defendant and Respondent, | C099770 |
| v. | (Super. Ct. No. 34-2019-00248972-CU-BC-GDS) |
| MARK CHISICK et al., | |
| Defendants, Cross-complainants and Appellants. | |

Arthur J. Williams, Jr., made six loans totaling over $2.5 million to entities related to Mark Chisick and/or Raymond Sahadeo and subsequently assigned his interest in the two loans that are at issue on appeal to himself, as trustee of the Arthur J. Williams, Jr., and Anna Katherine Williams Revocable Living Trust, dated August 10, 1993 (the Williams Living Trust) and its Survivor's Trust.[1]  Arthur, as trustee, then sued Mark,

---

[1] Because some individuals share the same last name, we will refer to individuals by first name for clarity.

Raymond, and S360 Holdings, LLC for defaulting on the loans. Upon Arthur's death, Arn F. Williams, the successor co-trustee of the Williams Living Trust and its Survivor's Trust, was substituted in as the plaintiff. Judgment was entered in favor of Arn.

Mark and S360 Holdings, LLC (S360) now contend the trial court erred in (1) excluding an accounting of the loans under Evidence Code section 1154, (2) applying a Civil Code section 1916.1 exemption in rejecting their defense of usury, and (3) adopting a forensic accounting expert's method of allocating loan payments.

Finding no error, we will affirm the judgment.

BACKGROUND

The following facts are derived from the parties' stipulation of admitted facts and the trial court's detailed written ruling.

Mark and Raymond were licensed real estate brokers. They were managing members of S360, an entity they formed to buy a residential subdivision known as Villa Terrassa. They planned to fund construction at Villa Terrassa through private investors as no bank loans were available to them and they needed a quick turn-around on loans. The going interest rate for that type of funding was 12 percent.

Arthur was a retired electrician who was in his late 80's in 2009. Christopher, Arthur's grandson, worked as a construction manager for Mark and Raymond's various companies from 2009 to 2017. Jermaine Clarke worked for S360 as a licensed real estate broker.

Christopher introduced Arthur to Mark and Raymond in 2009. Jermaine gave Arthur a tour of Villa Terrassa and talked to him about making loans to S360. Raymond and Jermaine discussed with Arthur the business plan for Villa Terrassa and the proposed terms of investment.

Arthur made his first loan to S360 in June 2009. He loaned $500,000 for a "cash-out refinance" on Villa Terrassa. We will refer to that loan as Loan 1. To make the loan, Arthur refinanced his own property at an interest rate of 6 percent, and extended to S360

a loan with an interest rate of 12 percent. S360 took other loans with 12 percent interest during that time period.

S360 executed a promissory note, signed by Mark and Raymond as managers of S360, for $500,000 in favor of Arthur. The note contained a late-charge provision. It did not require monthly payments. Instead, it required payment of the principal and accrued interest on or before June 8, 2010.

The Loan 1 promissory note was secured by a deed of trust against real property. Mark and Raymond executed a personal guaranty for the loan. The guaranty provided: "Without regard to the form in which received, Guaranteed Party may apply any payment with respect to the Guaranteed Obligation or any other amounts due hereunder in such order as Guaranteed Party shall in its sole and absolute discretion determine, irrespective of any contrary instructions received from any other Person." Arthur, Mark, Raymond and Jermaine also signed a loan disclosure compensation agreement that identified Jermaine's Department of Real Estate license number and stated that all negotiations for Loan 1 were made through Jermaine.

Arthur made subsequent loans to S360 by refinancing personal property at an 8 percent interest rate and charging S360 12 percent interest. In November 2009, Arthur loaned S360 $800,000 for a cash-out refinance on specified lots at Villa Terrassa, which we will reference as Loan 2. Mark and Raymond, as managers of S360, executed a promissory note in favor of Arthur for $800,000, at 12 percent interest per annum, monthly interest payments of $4,639.99, and the remainder to be paid on or before November 17, 2010. Like the promissory note for Loan 1, the note for Loan 2 contained a late-charge provision and was secured by a deed of trust against real property. Mark and Raymond also executed a personal guaranty for Loan 2 that authorized the guaranteed party to apply payments in such order as the guaranteed party determined in his sole discretion. Arthur, Mark, Raymond and Jermaine signed a loan disclosure

3

compensation agreement stating that all negotiations for Loan 2 were conducted though Jermaine.

In March 2011, Mark and Raymond formed CS360 Towers, LLC (CS360 Towers) for the purpose of acquiring real property known as Bridgeway Towers North. That month Arthur loaned S360 $328,271.34 for a cash-out refinance on specified lots at Villa Terrassa, which we will reference as Loan 3. The funds were used on the Bridgeway Towers North project. S360, through Mark and Raymond as its managers, executed a promissory note in favor of Arthur in the amount of $328,271.34 with an interest rate of 12 percent per annum. The note stated that the principal and accrued interest were due on or before February 23, 2012. As with the other promissory notes, the note contained a late-charge provision and was secured by a deed of trust against real property. Mark and Raymond executed a personal guaranty containing the same provision quoted *ante* for Loan 1 regarding application of payments. Arthur, Mark, Raymond and Jermaine signed a loan disclosure compensation agreement stating that all negotiations for Loan 3 were made through Jermaine.

On January 26, 2012, Arthur lent CS360 Towers $211,880.52 and added that amount to Loan 3, increasing the balance of Loan 3 to $550,000. The transaction was reflected in a modification agreement executed by Mark and Raymond as managers of CS360 Towers. The $211,880.52 loan was secured by a deed of trust against real property. Mark and Raymond executed a personal guaranty for the $211,880.52 loan that contained a provision giving the guaranteed party sole discretion to determine how payments would be applied.

The loans from Arthur were not conventional loans and the higher interest rate for those loans reflected the ability to access cash immediately. Raymond worked with Jermaine to arrange Loans 1, 2 and 3. Jermaine assisted in determining the collateral for the loans. Raymond and Mark determined the interest rate. Jermaine worked to bring in

4

lenders and earned future commissions from home sales by helping raise capital. He also received free rent and office space.

On March 23, 2015, the parties executed agreements extending the maturity dates for the promissory notes on Loans 1, 2 and 3 to July 1, 2018. The extensions were signed by Mark and Raymond as managers of S360 or CS360 Towers.

In total, Arthur made six loans to defendants and related defendant entities between 2009 and 2016. Arthur assigned his interest in Loans 1, 2 and 3 to himself, as trustee of the Williams Living Trust and its Survivor's Trust, in 2018.

In 2019, Arthur, as trustee, sued Mark, Raymond, and S360 for nonpayment of the promissory notes, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and common counts. Arn, as successor co-trustee of the Williams Living Trust and its Survivor's Trust, became the plaintiff after Arthur's death.

A bench trial occurred on August 21 through 23, 2023. Christopher, Raymond, Arn, Mark, and expert witness Patrick Delangis testified. The trial court found that Raymond was a credible witness.

Delangis testified as a forensic accounting expert for plaintiff Arn. He testified as follows. As of August 21, 2023, the balance on Loan 1 was $1,734,543, and the balance on Loan 3 was $1,379,156. Loan 2 was paid off. The balance on the other loans made by Arthur totaled about $180,000. Delangis testified regarding exhibits detailing the balance on each loan and showing his accounting for Loans 1 and 3. He explained how he applied each loan payment, admitting that he did not know how Arthur had applied the loan payments. Arn agreed with how Delangis applied the loan payments from defendants. The trial court found that Delangis made judgment calls regarding the reasonable allocation of loan payments, and it found his explanation of his judgment calls credible. Defendants did not call an expert witness.

There was no request for a statement of decision, but the trial court issued a detailed ruling. It rejected the defense of usury, concluding that the Civil Code

5

section 1916.1 exemption to the usury prohibition applied. It found in favor of plaintiff Arn on the breach of contract cause of action and the cause of action for common counts. It found against Arn on the cause of action for breach of the covenant of good faith and fair dealing. It entered judgment in favor of Arn, as successor co-trustee, in the amount of $1,734,543 on Loan 1 and $1,379,156 on Loan 3.

DISCUSSION

I

Mark and S360 contend the trial court erred in excluding an accounting under Evidence Code section 1154.

A

Arn moved in limine to exclude, under Evidence Code section 1154, a document that had been attached to a November 7, 2018 letter from Arn's counsel Robert Merritt to Stephan Brown, counsel for Mark and S360, which set forth an accounting of the principal, accrued interest, and payments made on the loans. Mark and S360 opposed the motion and sought to admit the accounting to show that the loans had been paid off. The trial court granted the in limine motion.

B

Generally, we review a trial court's ruling on a motion in limine excluding evidence for abuse of discretion. (*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 533 (*Arave*); *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 (*Zhou*).) We presume the trial court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1413 (*Rayii*).) To the extent the trial court's ruling is based on its construction of Evidence Code section 1154, we review the ruling de novo. (*Arave,* at pp. 534-535; *Zhou*, at p. 1476.)

Evidence that a person has offered to accept a sum of money or any other thing in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof,

6

is inadmissible to prove the invalidity of the claim or any part of it.  (Evid. Code, § 1154.)  This rule reflects the public policy favoring settlement of disputes without litigation and is intended to promote candor in settlement negotiations.  (*Zhou, supra*, 157 Cal.App.4th at p. 1475.)  The rule does not apply unless the conduct or statement is related to an attempt to compromise and is offered to refute a claim of liability.  (*Arave, supra*, 19 Cal.App.5th at p. 534; *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1491.)  In the case of a statement, the intent of the person making the statement is dispositive in determining whether the statement constitutes an offer to compromise.  (*Arave,* at p. 534; *Volkswagen of America, Inc.,* at p. 1494.)  If the person making the statement intended to make no concessions but rather to assert all that he or she believed is owed, the statement is an admission against interest and not an attempt to compromise.  (*Arave,* at p. 534; *Volkswagen of America, Inc.,* at p. 1494.)

Arn submitted evidence of the intent behind the accounting.  Merritt, the author of the November 7, 2018 letter, averred he provided the accounting to opposing counsel in an effort to settle the matter.  Arn's counsel Daniel Osier averred that counsel were engaged in pre-litigation settlement negotiations from October to November 2018, and the accounting was part of those negotiations.  Merritt's November 7 letter indicated that Arn was interested in resolving the matter "quickly and economically for all parties."  His November 16, 2018 e-mail to Brown stated that Arn was "attempting to avoid filing the Complaint and litigating this matter, so hopefully we can reach some resolution prior to litigation."  In addition, the accounting showed a lower balance due on Loans 1 and 3 than the accounting presented at trial, indicating an objective to compromise Arn's claim.  (Cf. *Arave, supra*, 19 Cal.App.5th at p. 535 [concluding that a letter demanding the plaintiff's maximum claim was not a compromise and noting that the trial evidence showed a lower damages amount than the amount demanded in the pre-lawsuit letter].)  Defendants did not present evidence regarding intent.

Mark and S360 sought to admit the accounting to prove the invalidity of Arn's claim that defendants still owed money under the loans.  On appeal, they contend the accounting showed how Arthur allocated loan payments and what Arthur believed was still owed on the loans.  The factual assertion, made without citation to the portion of the record supporting it, is forfeited.  (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)  In any event, we found nothing in the record showing that the accounting evinced how Arthur actually applied loan payments.  Merritt averred that the accounting was prepared by Christopher.  Because Arn presented evidence that the accounting was offered to settle the matter, the trial court did not abuse its discretion in ruling it was inadmissible under Evidence Code section 1154 to prove the invalidity of Arn's claim.  In light of our conclusion, we do not consider Arn's claims regarding waiver and alternate grounds for affirming the trial court's order.

## II

Mark and S360 next argue the trial court erred in applying the Civil Code section 1916.1 exemption to the usury prohibition.

Article XV, section 1 of the California Constitution sets forth California's prohibition against usury.  (*Stoneridge Parkway Partners, LLC v. MW Housing Partners III, L.P.* (2007) 153 Cal.App.4th 1373, 1379 (*Stoneridge Parkway Partners*).)  It limits the interest rate lenders can charge on nonpersonal loans.  (*Ibid.*)  The limitation does not apply to loans " 'made or arranged by any person licensed as a real estate broker by the State of California and secured in whole or in part by liens on real property.' "  (*Ibid.*, quoting Cal. Const, art. XV, § 1.)

Civil Code section 1916.1 implements the constitutional exemption.  (*Stoneridge Parkway Partners, supra*, 153 Cal.App.4th at p. 1379.)  At the time of trial, the statute provided:  "The restrictions upon rates of interest contained in Section 1 of Article XV of the California Constitution shall not apply to any loan or forbearance made or arranged

by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property."[2]  (Civ. Code, former § 1916.1; Stats. 1985, ch. 489, § 1.)  We construe Civil Code section 1916.1 broadly to promote its purpose of increasing the availability of money for nonconsumer loans.  (*Del Mar v. Caspe* (1990) 222 Cal.App.3d 1316, 1326 (*Del Mar*).)

Mark and S360 challenge the trial court's ruling that Jermaine arranged the loans. We review a trial court's determination as to whether a loan was arranged by a licensed real estate broker within the meaning of Civil Code section 1916.1 under the substantial evidence standard.  (*Del Mar, supra*, 222 Cal.App.3d at p. 1324; *Jones v. Kallman* (1988) 199 Cal.App.3d 131, 134-136 (*Jones*); *Stickel v. Harris* (1987) 196 Cal.App.3d 575, 584-585; cf. *Gibbo v. Berger* (2004) 123 Cal.App.4th 396, 400 (*Gibbo*).)  Under that standard of review, we view the whole record in a light most favorable to the judgment, giving the prevailing party the benefit of every reasonable inference, and resolving all conflicts in the evidence in support of the judgment.  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)  Our task begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, to support the findings of the trier of fact.  (*Ibid.*; *Del Mar,* at p. 1324.)  "Substantial evidence is evidence 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.' " (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1208.) We do not reweigh the evidence or consider the credibility of the witnesses.  (*Id.* at p. 1209.)  The appellant bears the burden of demonstrating that there is no substantial evidence to support the challenged factual finding.  (*Id.* at p. 1208.)  If substantial

---

[2]  Effective January 1, 2025, section 1916.1 was amended to also apply to any extension or modification of a loan made or arranged by a real estate broker licensed by the State of California and secured by a lien on real property.  (Stats. 2024, ch. 601, § 1.)

evidence exists, it is of no consequence that the trial court could have reached a contrary conclusion. (*Id.* at p. 1209.)

As relevant here, a loan or forbearance is arranged by a licensed real estate broker when the broker "acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another." (Civ. Code, former § 1916.1; Stats. 1985, ch. 489, § 1.) The trial court found that only Loans 1 and 3 were at issue, and Mark and S360 do not dispute that finding. Accordingly, we limit our discussion to those loans. The question is whether Jermaine or Raymond, both of whom where licensed real estate brokers, acted for another to solicit, negotiate, or arrange Loans 1 and 3 for compensation or in expectation of compensation.

The loan disclosure compensation agreement signed by Arthur, Mark, Raymond and Jermaine stated that Loans 1 and 3 were negotiated through Jermaine. The statement is conclusively presumed to be true. (Evid. Code, § 622; *Park Terrace Limited v. Teasdale* (2002) 100 Cal.App.4th 802, 806; see *Creative Ventures, LLC v. Jim Ward & Associates* (2011) 195 Cal.App.4th 1430, 1443.) Other evidence also supports the conclusion that Jermaine solicited and arranged Loans 1 and 3. Arranging a loan refers to conduct that causes a loan to be obtained. (*Gibbo, supra*, 123 Cal.App.4th at p. 402.) Such conduct includes structuring the loan, setting the interest rate and points to be paid, setting the terms of the agreement, reviewing the loan or forbearance documents, conducting title searches, drafting the terms of the loan, and approaching the lender for a loan. (*Id.* at pp. 402-403; *Park Terrace Limited,* at p. 806; *Del Mar, supra*, 222 Cal.App.3d at pp. 1328-1329; *Jones, supra*, 199 Cal.App.3d at p. 135.) A loan is not arranged merely by inserting terms the parties had agreed upon on prepared forms, ordering a policy of title insurance pursuant to the parties' instructions, or performing duties specified in escrow instructions prepared by the parties. (*Gibbo,* at p. 403.)

Raymond testified that Jermaine obtained lenders for S360. Jermaine talked to Arthur about loaning money to S360, discussing the terms of investment with Arthur.

10

Although Mark and S360 claim on appeal that there was no evidence Jermaine was involved in the modification of any loans, Raymond testified that he and Jermaine worked together to arrange Loans 1 and 3. Raymond said Jermaine helped determine the collateral for the loans, and that Raymond and Mark determined the interest rates. Documents relating to Loans 1 and 3 show the loans were for S360 and not for Jermaine or Raymond personally. Substantial evidence supports the trial court's finding that Jermaine solicited and arranged Loans 1 and 3, including the modification to Loan 3.

Substantial evidence also supports the trial court's finding that Jermaine received or expected to receive compensation for soliciting and arranging the loans. Courts have construed compensation broadly in this context. (*Jones, supra*, 199 Cal.App.3d at p. 136-137.) Raymond testified that for arranging the loans from Arthur, Jermaine received free office space and facilitated future commissions on home sales for himself.

Mark and S360 nevertheless argue there was no evidence Jermaine was involved in negotiating or arranging any loan modification, and no evidence of specific compensation that Jermaine received or expected to receive. But the portions of the record they cite in their appellate opening brief do not support their factual assertions.

Mark and S360 also claim the Civil Code section 1916.1 exemption does not apply because the negotiation, solicitation, or arranging of the loans was not done for another. The argument lacks merit. A broker negotiates, solicits or arranges a loan for another when the broker negotiates, solicits or arranges a loan for a legal entity separate and distinct from the broker. (*Bock v. California Capital Loans, Inc.* (2013) 216 Cal.App.4th 264, 269-271; *Stoneridge Parkway Partners, supra*, 153 Cal.App.4th at p. 1380.) As we have explained, Loans 1 and 3 were for S360. A limited liability company is a separate legal entity, distinct from its members. (Corp. Code, § 17701.04, subd. (a); *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220; *PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963.) Substantial evidence

11

supports the trial court's finding that the negotiation, solicitation, or arranging of Loans 1 and 3 was done for another.

Mark and S360 note that subpart (2) of Civil Code section 1916.1 provides that a loan is arranged by a broker when the broker acts for the selling or buying of real property or a business. But subpart (1) of that section states a loan is arranged by a broker when the broker "acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan, or forbearance, extension, or modification of the loan, for another." (Civil Code, § 1916.1.) Even if subpart (2) is not applicable to the loans, an issue we do not decide, subpart (1) is applicable here, and Mark and S360's argument lacks merit.

In addition, Mark and S360 appear to argue that the Civil Code section 1916.1 exemption does not apply to the March 23, 2015 agreements extending the maturity date of the promissory notes for Loan 1 and 3. However, whether the March 23, 2015 agreements were subject to the usury prohibition or the Civil Code section 1916.1 exemption was not litigated in the trial court. For that reason, we do not consider the appellate claim. (*Damiani v. Albert* (1957) 48 Cal.2d 15, 18; *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340-341.) Although an appellant may be allowed to assert a new theory on appeal in certain circumstances, where the new theory pertains to disputed factual circumstances and was not presented at trial, the opposing party should not be required to defend against it on appeal. (*Panopulos,* at p. 341; see *Rayii, supra,* 218 Cal.App.4th at p. 1409.)

## III

Mark and S360 further contend the trial court abused its discretion in adopting Delangis's method of allocating loan payments, because Arthur had discretion as to how payments were applied and Delangis did not know how Arthur had applied the payments.

A party may introduce expert opinion testimony on damages. (See, e.g., *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 526, 570-574.) A "trial court

must exclude expert opinion testimony 'that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.' [Citation.] The trial court's gatekeeping role as to expert testimony . . . is to determine 'whether the expert opinion is founded on sound logic' rather than to assess its 'persuasiveness.' " (*Id.* at p. 571.) We review the trial court's decision to admit the testimony of a damages expert witness for abuse of discretion. (*Id.* at pp. 571-574; *City of Fremont v. Fisher* (2008) 160 Cal.App.4th 666, 675-677; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773, 775-781.)

Delangis produced an accounting for the loans made by Arthur based on promissory notes, deeds of trust, personal guaranties, loan modifications, bank statements, canceled checks, and deposition transcripts. He testified that exhibit numbers 196, 198 and 213 to 218 set forth his work.

In explaining how he applied each loan payment, Delangis said that, consistent with standard practices for accounting and lending, he applied each loan payment to late fees first, then to interest, and then to principal. Delangis said it is a basic tenet that a lender wants to maximize the return on investment.

Mark and S360 do not contend that treatment of the loan payments was improper. Rather, they argue Delangis's opinion was based on speculation because there was no evidence regarding which loan Arthur applied loan payments. However, Arn testified he agreed with how Delangis applied the loan payments. It is true that the personal guaranties granted by Mark and Raymond gave the guaranteed party sole discretion to determine how to apply loan payments, but the guaranties inured to the benefit of Arn, the successor and assignee. A successor trustee succeeds to all rights, duties and responsibilities of a predecessor trustee. (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1131.)

13

Delangis explained how he applied loan payments among the various loans. As an example, he explained that he applied certain payments to Loan 2 instead of Loan 1 because Loan 2 required monthly payments and a late fee would be charged if a monthly payment was not made. He also explained how he applied an $800,000 payment to pay off Loan 2. Raymond testified about an $800,000 payment made to Arthur when Villa Terrassa was sold. Mark and S360 do not establish that the methodology and assumptions used by Delangis were improper, or that the trial court abused its discretion.

We do not consider Mark and S360's claims based on Civil Code section 1479 because the claims were raised initially in their appellate reply brief without a showing of good cause. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

DISPOSITION

The judgment is affirmed.


_____/S/_____
MAURO, Acting P. J.


We concur:


_____/S/_____
BOULWARE EURIE, J.


_____/S/_____
MESIWALA, J.

14