[No. H034883. Sixth Dist. May 31, 2011.]

CREATIVE VENTURES, LLC, et al., Plaintiffs and Appellants, v.
JIM WARD & ASSOCIATES, A CALIFORNIA CORPORATION,
Defendant and Appellant;
MAHMUD ASSAR et al., Defendants and Respondents.

1432

1434

## Counsel

Crist, Biorn, Shepherd & Roskoph, Kristofer W. Biorn, Jay C. Patterson for Plaintiff and Appellant Creative Ventures LLC.

Miller Starr & Regalia and David E. Harris for Plaintiff and Appellant Arden 2002 LLC.

Law Offices of David M. McKim and David M. McKim for Defendant and Appellant.

Law Offices of Desmond B. Tuck and Desmond B. Tuck for Defendants and Respondents.

## Opinion

**PREMO, J.**—Plaintiffs Creative Ventures, LLC (Creative), and Arden 2002, LLC (Arden), borrowed nearly $3 million from defendant Jim Ward & Associates (JWA), a California Corporation, to finance two real property development projects. The loans were evidenced by four promissory notes secured by deeds of trust on the real property. Each of the notes called for interest payments in excess of the maximum permitted by the California Constitution. (Cal. Const., art. XV, § 1.) The interest charges would have been lawful if the loans had been "made or arranged" by a licensed real estate broker (Civ. Code, § 1916.1), as JWA held itself out to be. As it happened, JWA was not so licensed. Upon discovering the deficiency, plaintiffs sued JWA for usury, breach of contract, and fraud. As to the usury and breach of contract causes of action, plaintiffs also named as defendants 54 individual investors (Investors) to whom JWA had assigned fractional interests in the notes.

The trial court found JWA liable for usury and fraud. The court found Investors were not liable for usury because they were holders in due course of the loan instruments. JWA and plaintiffs have filed cross-appeals. We shall reverse.

With regard to JWA's appeal, we conclude that the evidence is sufficient to support the trial court's ruling that JWA committed usury but the evidence is insufficient to prove fraud. As to plaintiffs' appeal, we conclude that Investors are not holders in due course.

I. *Factual and Procedural Background*

Creative and Arden were formed to pursue two separate real property developments known respectively as the Buckmeadow and Perry projects. Jonathan Schink is the managing member of both companies. James S. Ward is a businessman who was a licensed real estate broker at all times pertinent here.

Schink met Ward in the early 1990's, when Ward's firm provided Schink with one or two construction loans. At the time, Ward's firm was Jim Ward & Associates, Inc. (JWA Inc.). JWA Inc. was merged out of existence in 1997 when Ward retired and moved to Ohio. Ward was not retired long before he decided to get back into the lending business. In August 2000, with the help of Attorney David S. Lee, Ward formed JWA, a mortgage lender and loan processing company.

When Schink learned that JWA was up and running he approached the firm about more loans. Schink had had an unsatisfactory experience with the successor to JWA Inc., which had run out of money before fully funding a loan it had promised. The new JWA business model supposedly eliminated that problem by fully funding the loan for each project in advance and maintaining the funds in a trust account earmarked for the project. This made the loan more expensive than other loans because the borrower had to pay interest on the full amount from the inception of the loan, rather than on the amounts disbursed over the course of the loan term, but it assured the developer a funding source to finish his project.

Schink met with Ward, Lee, and JWA employee Ed Locker, in or about February 2003, to discuss a loan for Arden's Perry project, a proposed single-family residence in Menlo Park. But the terms offered were too expensive for Schink so he went elsewhere for the money. In August or September 2003, Schink telephoned Locker about Creative's Buckmeadow project, a single-family residence in Portola Valley. Schink met with Locker and Lee and discussed Buckmeadow and a refinance of the Perry project. Lee "ran his formula" and told Schink he thought they "looked like good projects. They'd be interested in doing those." Ultimately, Schink obtained financing from JWA for both projects.

The negotiations, drafting, and other tasks required to put the two deals together were performed primarily by Schink on one side and by Ward, Lee,

and Locker on the other. Schink claimed to have obtained most of his information from Lee and Locker, not from Ward. Ward, on the other hand, testified that he did all the underwriting, negotiating loan terms, and soliciting investors. It was "totally me," he said. Lee and Locker denied ever quoting rates or terms on the loans. Lee said that Ward came to his own decisions on "how to properly structure the deal, how much down payment he would like to see, how much equity, interest rates. That was all determined by Jim." Lee would just draw up the documents. Locker presented only those loan terms "given to me from Jim." In describing what was done to put the deals together, Lee used the pronoun "we," specifying that by "we," he meant "the company."

The Creative and Arden transactions were finalized on October 8, 2003. Each deal was documented with five instruments: two promissory notes, two deeds of trust, and a construction loan agreement. Creative borrowed a total of $2 million for Buckmeadow. In the first promissory note, Creative promised "to pay to the order of JIM WARD & ASSOCIATES (the 'Holder,' which term shall include all assignees of this Note)," the principal sum of $1.2 million at 8 percent interest. The note further recited: "The loan evidenced by this Note has been arranged by a real estate broker licensed under the laws of the State of California. Maker shall pay the broker, JIM WARD & ASSOCIATES, a fee in the amount of six percent (6%) of the initial principal sum of this Note as set forth above." The second note was for $800,000 at "Twelve percent (12.00%)" interest. It included the same definition of "Holder," the same recitation pertaining to the licensed broker, and the same 6 percent fee payable to the broker, JWA. (The 12 percent interest rate was evidently an error. The parties agree that Creative actually paid 10 percent plus the 6 percent broker's fee.) The construction loan agreement contained an attorney fees clause.

Arden borrowed $512,000 at 8 percent interest and $450,000 at 10 percent interest for the Perry project. Each note called for a broker's fee of 4 percent. In all other pertinent respects the Arden documents were identical to those used for the Creative loans.

The transactions proceeded as the parties expected they would. JWA solicited Investors to fund the loans and assigned Investors their fractional interests in the investments, evidenced by separate loan servicing agreements between JWA and each of the individual Investors. JWA disbursed the loan proceeds to plaintiffs. Plaintiffs paid the interest and the broker's fees and ultimately repaid the principal. Pursuant to the loan servicing agreements, JWA retained physical possession of the notes, collected the loan payments from plaintiffs, and disbursed the principal and interest to Investors, retaining the broker's fees for itself.

Schink had begun to suspect something was amiss when, toward the end of 2004, he approached Locker about extending the term of the Arden loan in order to take advantage of what was then a rapidly rising market. Locker told him JWA was not interested, which seemed odd to Schink because the "numbers were good." Sometime shortly thereafter Schink asked JWA for additional funding for enhancements proposed by the prospective buyer of the Buckmeadow property. JWA's equivocal response caused Schink further concern.

In June or July of 2005, Schink learned that California's Department of Real Estate (DRE) was investigating JWA and had filed an accusation against it. Schink attended the administrative proceedings and discovered that JWA was not licensed and, therefore, that plaintiffs' loans were not exempt from the usury law, which capped the total of interest and broker's fees JWA could charge at 10 percent. Plaintiffs filed this lawsuit, seeking nullification of the interest terms and return of all interest and broker's fees they had paid under what they claimed were illegal interest provisions. Plaintiffs also sought the treble damages penalty for usury.

Plaintiffs' third amended complaint contains causes of action for usury and breach of contract against JWA and Investors and causes of action for fraud and negligent misrepresentation against JWA only. The usury cause of action was based upon the interest rates charged in the promissory notes. The breach of contract cause of action concerned the manner in which JWA had calculated and collected the interest payments. The deceit causes of action related to JWA's representing itself to be licensed.

Trial was to the court. JWA and Investors maintained that because the loans had actually been arranged by Ward, who was licensed, the loans were exempt from the usury laws. Investors alleged in addition that they were not liable for usury or breach of contract because they did not know about the brokerage fees, never received interest of more than the constitutional maximum, and were not in privity of contract with plaintiffs.

Two Investors testified at trial. Robert Geise stated that he invested $25,000 in a note and deed of trust by which he earned 8 percent interest. Geise knew that he was lending money to Ward to lend to a third party. He assumed that Ward would be paid some fee for his services. Geise never saw the promissory note in which he acquired an interest. Apart from believing that Ward was a licensed broker, Geise had no understanding of the brokerage business. Investor Bruce Dougherty invested $40,000. He earned 8 percent on one note and 10 percent on another. He never saw either note. He had had transactions with multiple entities having the name "James Ward" in their title. He did not know which was which.

At the time the parties negotiated the loans, Schink believed that the broker with which he was dealing was JWA. Lee told him "on a number of occasions that [JWA] was the real estate broker—brokerage firm that I was dealing with as well as all the documents that I signed." JWA's solicitation brochures also indicated that it was a licensed broker. But, in fact, there is no record that JWA was ever licensed. On April 19, 1999, about the time Ward was coming out of retirement but before JWA was formed, Ward requested, and the DRE issued, a renewal of the license for JWA Inc., the by-then nonexistent company. Ward requested renewal of that license again on April 10, 2003. Up to that point, no one had requested a license for JWA.

Ward testified that he thought JWA was properly licensed, having delegated the paperwork responsibilities to Lee or others in the company. Lee, too, believed JWA was licensed. He had formed the corporation in 2000 but did not pursue licensing because he believed that another attorney was going to take care of that. When asked why he included the licensed-broker recitals in plaintiffs' promissory notes, Lee stated, "Well, at that time I believed JWA was licensed by the DRE."

Sometime before the October 8, 2003 execution of plaintiffs' loan agreements, the DRE had commenced an audit of JWA based upon a suspicion that the company was unlicensed. On October 1, 2003, upon completion of the audit, the DRE auditor sat down with Lee and told him that JWA was not licensed. On December 24, 2003, the DRE sent JWA written notice of the auditor's conclusion. Days later, on December 30, 2003, JWA submitted its first license application. But on March 11, 2004, instead of issuing a license, the DRE filed accusations against Ward, JWA Inc., and JWA. The DRE ultimately revoked Ward's license and denied JWA's license application.

Following the trial in this case, the trial court issued a statement of decision finding that JWA had "mistakenly believed that it was licensed until October 1, 2003." David Lee was orally told on October 1, 2003, that the DRE auditor concluded that JWA was not licensed. "However, once he had this information he, as president and legal counsel of the company, proceeded to execute the contract documents at [JWA's] peril." The court further found that "[Ward] did not arrange the loan; [JWA] did." Thus, the loans had not been arranged by a licensed broker and the interest provisions, which exceeded the legal maximum, were null and void.

As to plaintiffs' request for treble damages, the trial court found that Ward testified credibly that he believed JWA was licensed and "thoughtlessly or carelessly" filled out the renewal application and gave it to Lee to review, believing that it was in order. Lee "was either careless or mistaken in his review, but he credibly testified that at the time he believed that [JWA] was

licensed. The Court finds that [JWA's] unlicensed status was the result of a mistake and therefore declines to award treble damages."

The trial court went on to find that JWA had defrauded plaintiffs "by falsely representing, in promotional materials and in the promissory notes, that it was a licensed real estate broker. Lee knew by October 1, 2003, and certainly by December 24, 2003, that the company was not licensed. Therefore, Plaintiffs are entitled to recovery on their fraud and negligent misrepresentation causes of action."

The trial court found that Investors were holders in due course, having taken "their fractional interests in the promissory notes for value, in good faith, and without notice of the additional 'loan fees' that rendered the notes usurious. They were ignorant of the fact that [JWA] was not a licensed broker, and they did not receive any part of the 'loan fees.' Accordingly, [Investors] are exempt from usury liability by virtue of their status as holders in due course. (*Liebelt v. Carney* (1931) 213 Cal. 250, 254 [2 P.2d 144] [when usurious note has been transferred to holder in due course, original payee is proper party defendant]; *Calimpco, Inc. v. Warden* (1950) 100 Cal.App.2d 429, 447 [224 P.2d 421].) Defendant [JWA] alone is liable." The trial court further concluded that plaintiffs had failed to prove breach of contract against Investors.

The trial court entered judgment against JWA in favor of Creative in the full amount of interest and loan fees it paid in connection with its loans ($333,606.03). The court entered judgment against JWA in favor of Arden in the full amount of interest and loan fees it paid in connection with its two loans ($173,217.02). The court made no separate award of damages for the fraud claims.

The trial court found plaintiffs to be the prevailing parties on the usury and deceit causes of action and Investors to be the prevailing parties on the breach of contract cause of action only. The court awarded attorney fees to each. This timely appeal followed.

## II. *JWA's Appeal*

JWA argues that the loans are exempt from the usury law because the loans were arranged by Ward, a licensed broker. As to the fraud and misrepresentation causes of action, JWA argues that plaintiffs failed to prove all the elements of those claims.

## A. *Usury*

### 1. *Legal Framework*

California law has long regulated interest on loans and judgments. (See *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 170–172 [74 P.2d 252] (*Penziner*).) By initiative in 1918, the people of the state enacted a comprehensive usury law that is set forth in an uncodified statute. (Stats. 1919, § 1, p. lxxxiii; see 9C West's Ann. Civ. Code (2010 ed.) foll. § 1916.12, designated as §§ 1916-1 to 1916-3, pp. 187–237 (hereafter, cites to the usury law will be to West's Civ. Code, §§ 1916-1 to 1916-3).) The usury prohibition was later incorporated into the California Constitution, but the 1918 statute remains in full force today to the extent it does not conflict with the Constitution. (*Penziner, supra,* 10 Cal.2d at pp. 170, 178.) Our use of the phrase "usury law" refers to both the constitutional and statutory provisions.

■ Article XV, section 1 of the California Constitution now sets the maximum rate lenders can charge on nonpersonal loans at "the higher of 10 percent or 5 percent plus the Federal Reserve Bank of San Francisco's rate on the 25th day of the month preceding the date the agreement was contracted." (*Stoneridge Parkway Partners, LLC v. MW Housing Partners III, L.P.* (2007) 153 Cal.App.4th 1373, 1379 [64 Cal.Rptr.3d 61] (*Stoneridge*).) For purposes of this case, the parties stipulated that 10 percent is the maximum rate allowed absent an exemption from the usury law.

■ There are two remedies available to borrowers who have paid interest under a usurious loan agreement. A borrower who pays interest at a usurious rate may recover treble the amount paid, "providing such action shall be brought within one year after such payment or delivery." (West's Civ. Code, § 1916-3, subd. (a).) The borrower also retains the common law right as a party to an illegal contract to bring an action for money had and received to recover usurious interest paid within two years of the suit. (*Stock v. Meek* (1950) 35 Cal.2d 809, 817 [221 P.2d 15].)

■ For purposes of the usury law, the interest charged is computed by adding the stated interest rate to any bonus the borrower must pay in addition. If the interest rate plus the bonus exceeds the statutory limit, the loan is usurious. (*Forte v. Nolfi* (1972) 25 Cal.App.3d 656, 679 [102 Cal.Rptr. 455].) Since each of the loans here called for an interest rate plus broker's fee that together exceeded 10 percent, the loans are usurious unless an exemption applies.

■ A loan is exempt from the usury law if the loan is "made or arranged by any person licensed as a real estate broker by the State of California and

secured in whole or in part by liens on real property . . . ." (Cal. Const., art. XV, § 1.)[1] Broker "made" loans are those in which the broker acts as a principal by lending the broker's own money. (*Winnett v. Roberts* (1986) 179 Cal.App.3d 909, 917 [225 Cal.Rptr. 82].) Broker "arranged" loans are those in which the broker acts as an intermediary and causes a loan to be obtained or procured as by structuring the loan as the agent for the lender, setting the interest rate and points to be paid, reviewing the loan and forbearance documents, conducting title searches, or drafting the terms of the loan. (*Gibbo v. Berger* (2004) 123 Cal.App.4th 396, 402 [19 Cal.Rptr.3d 829], and cases cited.)

 Licensed real estate brokers may be either individuals or corporations; the DRE issues licenses to both. When a license is issued to a corporation, it is through the license of a designated officer of the corporation. (Bus. & Prof. Code, § 10211; and see, e.g., *Amvest Mortgage Corp. v. Antt* (1997) 58 Cal.App.4th 1239, 1243 [68 Cal.Rptr.2d 457].) If there is no licensed officer, no licensed activities may be performed for or in the name of the corporation. (Cal. Code Regs., tit. 10, § 2740.) When there is a designated officer, only the designated officer may conduct licensed activities on the corporation's behalf. Other officers may act under the corporation's license only if the corporation procures additional licenses to employ each additional officer. (Bus. & Prof. Code, §§ 10158, 10211.)

### 2. *Issue and Standards of Review*

JWA argues that the instant loans are exempt from the usury law because, as a corporation, it could only act through its directors, officers, or other

---

[1] The exemption is codified in Civil Code section 1916.1, which provides in full: "The restrictions upon rates of interest contained in Section 1 of Article XV of the California Constitution shall not apply to any loan or forbearance made or arranged by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property. For purposes of this section, a loan or forbearance is arranged by a person licensed as a real estate broker when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another, (2) acts for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business for another and (A) arranges a loan to pay all or any portion of the purchase price of, or of an improvement to, that property or business or (B) arranges a forbearance, extension, or refinancing of any loan in connection with that sale, purchase, lease, exchange of, or an improvement to, real property or a business, or (3) arranges or negotiates for another a forbearance, extension, or refinancing of any loan secured by real property in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business. The term 'made or arranged' includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license."

agents and the loans were actually arranged by Ward, who was licensed. To the extent the argument presents a question of law, we apply the independent standard of review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960] (*Ghirardo*).) The factual question is reviewed under the substantial evidence standard. "Our task on appeal is merely to view all factual matters in favor of the prevailing party and in support of the judgment, disregarding evidence to the contrary, and decide whether there is any substantial evidence, contradicted or uncontradicted, to support the findings and conclusions of the trier of fact." (*Del Mar v. Caspe* (1990) 222 Cal.App.3d 1316, 1324 [272 Cal.Rptr. 446].)

### 3. *Discussion*

■ JWA's argument that it is impossible for a corporation to act other than through its officers and directors is something of a non sequitur. Although a corporation can only act through natural persons, those actions are deemed the actions of the corporation when undertaken in good faith on behalf of the corporation. (See, e.g., Corp. Code, §§ 309, 317.) Thus, although the parties argue over the evidence of Ward's role in the negotiations, the arguments miss the point. The question is not what Ward did but whether he was acting on behalf of the corporation or in his individual interest when he did it. As to that factual question, the trial court implicitly found that, to the extent Ward was involved, he was acting on behalf of JWA. There is ample evidence to support the finding.

We begin with the language of the promissory notes, which specifies that the loans were being arranged by a licensed broker and identifies the broker as JWA. These factual recitations are evidence that the parties believed that JWA was the broker arranging the loans. Citing *Stoneridge, supra,* 153 Cal.App.4th at page 1382, JWA argues that we must look past these factual recitals. In *Stoneridge,* the factual recitation was that the loan was " 'made and/or arranged by WRI Investments . . .' " and that " 'no broker other than [Housing Partners] has been involved in the negotiation of the Loan . . . .' " (*Ibid.*) The undisputed evidence showed, however, that the facts recited in the document were drafting errors. The true intent of the parties was that the loan was being arranged by an individual named Marsh. Evidence Code section 622, which would ordinarily make the factual recitals conclusive as between the parties, did not apply. (*Stoneridge, supra,* at p. 1382.) The appellate court looked past the recitation to the parties' true intent, which was that Marsh arranged the loan. (*Id.* at pp. 1383–1384.)

Here, the evidence supports the trial court's conclusion that the parties' true intent was that JWA arranged the loans. Schink thought JWA was the broker arranging the loans because that is what Lee told him and that is what

he read in the loan documents. That Lee and Ward believed the transaction was conducted on behalf of the corporation is evidenced by their mutual belief that the corporation was licensed; licensing the corporation was a concern only if the loans were to be arranged on behalf of the corporation. Lee's understanding that the individuals were acting on behalf of the corporation is further evidenced by his describing lending practices not in terms of what Ward did, but in terms of what the company did. This is substantial evidence to support the trial court's conclusion that the parties' true intent was that JWA arranged the loans; Ward, Lee, and Locker acted on behalf of JWA. Since JWA was not licensed, the loans are not exempt from the usury laws. The trial court did not err in declaring the interest terms null and void and finding JWA liable for usury.

## B. *Fraud*

■ JWA's next argument is that there is insufficient evidence to support the elements of the fraud and negligent misrepresentation causes of action. We agree. In order to recover for either tort, plaintiffs had to prove that the alleged misrepresentation resulted in a *loss*. Deception without loss is not actionable. (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364 [17 Cal.Rptr.3d 39].) Plaintiffs' success on the usury cause of action entitled them to return of the interest they paid on the loans, which is the amount the trial court awarded, but that does not reflect a loss resulting from the misrepresentation.

The record unequivocally demonstrates that plaintiffs wanted to borrow money to fund two real property developments. The loans were essential to plaintiffs' profit-making enterprise. If plaintiffs had known that JWA was not licensed, it is reasonable to infer that they would have entered into some other loan agreement, whether with JWA or a different lender. There is no evidence to suggest that plaintiffs would have foregone borrowing any money at all. Indeed, Schink had already obtained a loan for the Perry project; the JWA loans merely refinanced that project. Furthermore, there is no evidence that, had plaintiffs known of the licensing problem, JWA would have lent the money at a lesser rate or that plaintiffs could have secured similar loans at lower rates elsewhere. Plaintiffs made no effort to demonstrate any losses arising from the misrepresentation and we can infer none from the evidence before us. Because the judgment erroneously finds plaintiffs to be prevailing parties on the fraud and negligent misrepresentation causes of action, it must be reversed. Furthermore, given the complete absence of evidence of damages arising from the misrepresentation, we are satisfied that plaintiffs cannot prevail and that judgment should be entered for defendant on these claims. (*Burtis v. Universal Pictures Co., Inc.* (1953) 40 Cal.2d 823, 835 [256 P.2d 933]; Code Civ. Proc., § 43.)

III. *Plaintiffs' Appeal—Judgment in Favor of Investors*

We now turn to plaintiffs' appeal. Plaintiffs argue that the trial court erred in concluding that Investors are holders in due course and, in any event, they did not receive a usurious amount of interest and did not intend to break the law and, therefore, cannot be liable for usury. Plaintiffs also challenge the trial court's failure to award treble damages against JWA and its award of attorney fees to Investors.

A. *Investors' Status as Holders in Due Course*

1. *Issue and Standard of Review*

Plaintiffs maintain that the trial court erroneously relied upon the holder-in-due-course defense because Investors never pleaded it. In the alternative, plaintiffs argue that the evidence is insufficient to support the finding. The latter argument is dispositive. Since it turns upon undisputed facts, the question—whether Investors may be deemed holders in due course—is a question of law calling for de novo review. (*Ghirardo, supra*, 8 Cal.4th at p. 799.)

2. *Discussion*

The parties agree that the promissory notes are negotiable instruments and, as such, are subject to division 3 of the California Uniform Commercial Code. Under California Uniform Commercial Code section 3305, subdivision (b), a holder in due course takes his or her interest free of many defenses, including the defense of usury. (See U. Com. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 3305, pp. 327–328; *Nuckolls v. Bank of California* (1937) 10 Cal.2d 278, 285 [74 P.2d 271].)[2] A

---

[2] California Uniform Commercial Code section 3305, subdivisions (a) and (b) provide:

"(a) Except as stated in subdivision (b), the right to enforce the obligation of a party to pay an instrument is subject to all of the following:

"(1) A defense of the obligor based on (A) infancy of the obligor to the extent it is a defense to a simple contract, (B) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (C) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (D) discharge of the obligor in insolvency proceedings.

"(2) A defense of the obligor stated in another section of this division or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract.

"(3) A claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.

"(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in paragraph (1) of subdivision (a), but is

holder in due course is the "holder of an instrument" who took the instrument for value, in good faith, and without notice "that any party has a defense or claim in recoupment described in subdivision (a) of Section 3305." (Cal. U. Com. Code, § 3302, subd. (a)(2).) Thus, in order to be a holder in due course, one must be a "holder" of the instrument. The "holder" is the "person in possession of a negotiable instrument that is payable either to bearer or, to an identified person that is the person in possession." (*Id.*, § 1201, subd. (b)(21)(A).) The promissory notes in this case are payable to JWA, which is also in possession of the notes. Accordingly, JWA is the holder.

■ Investors argue that they are in constructive possession of the notes because JWA is their agent and, since the notes include "all assignees" in their definition of holder, Investors must be holders of the notes. The problem with the argument is that, notwithstanding the definition in the notes, the notes have no identifiable payee other than JWA. A negotiable instrument may be payable to named persons or to an account, a trust, an estate, a trustee, or other identifiable payee. (Cal. U. Com. Code, § 3110, subd. (c).) But an assignee could be anybody. It is impossible to identify, from the designation "all assignees," to whom the note is payable.

■ Investors might have become holders had JWA negotiated the notes by indorsing and transferring possession to Investors. (Cal. U. Com. Code, § 3201.) But negotiation does not take place, and the transferee does not acquire the rights of a holder, unless the instrument is indorsed. (*Id.*, § 3203, subd. (c).) It follows that, since there is no evidence that JWA negotiated the promissory notes by indorsement and delivery, Investors cannot be holders in due course.

The negotiation requirement may seem a bit formalistic, but it has a sound historical and mercantile basis. At common law, contracts could not be transferred so as to give the transferee a right to enforce the contract directly. The law of negotiable instruments was adopted by the law merchant as an exception to this rule, in order to allow the indorsee the right to sue on the contract in his or her own name. (*Shaw v. Railroad Co.* (1879) 101 U.S. 557, 563–564 [25 L.Ed. 892].) Classically, negotiability carries with it a number of other characteristics. For example, transfer may be perfected without notice to the primary debtor and the indorsee may take the instrument as a holder in due course, free from the defenses available to prior parties among themselves. (Smith, *The Concept of "Negotiability" as Used in Section 47 of the Negotiable Instruments Law* (1929) 7 Tex. L.Rev. 520, 522.) These characteristics of negotiable instruments allow them to be used as "representatives" or "evidence" of money " 'of which any person in lawful possession may avail

---

not subject to defenses of the obligor stated in paragraph (2) of subdivision (a) or claims in recoupment stated in paragraph (3) of subdivision (a) against a person other than the holder."

himself to pay debts or make purchases or make remittances of money from one country to another, or to remote places in the same country.' " (*Shaw v. Railroad Co., supra*, at p. 564.) The holder-in-due-course concept insures a market for the instruments; without the rule, the instruments could not perform their function as money substitutes. (*Ibid.*)

It follows that, when one negotiates an instrument, one transfers the instrument itself. An assignment, on the other hand, usually refers to the transfer of a cause of action or rights in or concerning property—as opposed to the particular item of property itself. (*Commercial Discount Co. v. Cowen* (1941) 18 Cal.2d 610, 614 [116 P.2d 599].) In the case of assignment, the assignee's rights are derivative of whatever rights the assignor may have. Thus, the general rule is that the assignee takes subject to all equities and defenses existing in favor of the maker. (10 Cal.Jur., Bills and Notes, § 336, citing *McGarvey v. Hall* (1863) 23 Cal. 140; Civ. Code, § 1459.) An assignee " ' "stands in the shoes" ' " of the assignor, taking his or her rights and remedies subject to any defenses the obligor has against the assignor prior to notice of the assignment. (*Royal Bank Export Finance Co. v. Bestways Distributing Co.* (1991) 229 Cal.App.3d 764, 768 [280 Cal.Rptr. 355]; see *Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 622 [39 Cal.Rptr.2d 159]; Rest.2d Contracts, § 336.)

The foregoing concepts are preserved in the national Uniform Commercial Code and the California Uniform Commercial Code. (See, e.g., Cal. U. Com. Code, §§ 3301, 3305.) Whereas transfer of a negotiable instrument by indorsement and delivery for value, in good faith, gives the transferee rights as a holder in due course of the instrument, transfer absent negotiation merely "vests in the transferee *any right of the transferor* to enforce the instrument." (*Id.* § 3203, subd. (b), italics added.) That is, absent negotiation, the transferee's rights are gleaned not from the instrument but are derivative of the rights held by the transferor. (U. Com. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code, *supra*, foll. § 3203, p. 246.) Furthermore, where the transferor "purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this division and has only the rights of a partial assignee." (Cal. U. Com. Code, § 3203, subd. (d).) In other words, a partial assignee cannot be a holder in due course.

In the present case, JWA did not negotiate the promissory notes. Even if we accept Investors' argument that they have constructive possession of the notes through their agent, JWA, there is no evidence that JWA indorsed the notes to Investors. Furthermore, it is undisputed that, as to each Investor, JWA purported to transfer only a fraction of the entire instrument. This means that Investors are not holders of the notes; they have no right to transfer the

notes to someone else nor may any individual Investor sue on the notes in his or her own name. Rather, the rights Investors have are those derived from JWA. They took their fractional interests subject to any equities and defenses existing in favor of plaintiffs at the time of assignment. (Civ. Code, § 1459.)

Investors cite *D'Orazi v. Bank of Canton* (1967) 254 Cal.App.2d 901, 905 [62 Cal.Rptr. 704], for the rule that partial assignees may enforce their interests in a note where all assignees are joined in the enforcement action. Indeed, the California Uniform Commercial Code excludes partial assignments from the rules governing negotiation because "[t]he cause of action on an instrument cannot be split." (U. Com. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code, *supra*, foll. § 3203, com. 5, p. 246.) But the rule does not alter the conclusion that Investors are assignees. Since JWA did not negotiate the notes to Investors, Investors cannot be holders of the instruments and, therefore, cannot be holders in due course. The trial court erred in finding otherwise.

## B. *Actual Receipt of Usurious Interest*

Investors maintain that, even if they cannot be considered holders in due course, they did not actually receive any usurious interest and so are not liable to pay it back. This, again, is a legal question we review de novo. (*Ghirardo, supra*, 8 Cal.4th at p. 799.)

It is true that the amount of the interest payments Investors actually received did not exceed 10 percent. But since the trial court found that the interest terms were null and void, Investors had no right to interest in any amount. Investors rely upon *Penziner, supra*, 10 Cal.2d at page 179, which held: "It is only when there has been an actual payment of usurious interest that the one receiving such interest is held to have violated the terms of the usury law and accordingly held liable for the penalties thereby imposed." Investors interpret the holding as stating that they cannot be liable for usury unless they actually received more than 10 percent interest. But *Penziner* concerned the penalty, which allows an obligor who has paid usurious interest to recover "treble the amount of the money so paid." (West's Civ. Code, § 1916-3, subd. (a).) In *Penziner*'s reference to "actual payment of usurious interest" the implicit emphasis is on *actual payment*. The penalty can only be calculated based upon the amount of interest that was actually paid by the borrower and received by the person to be penalized. Thus, in *Liebelt v. Carney, supra*, 213 Cal. 250, the plaintiff could not recover the penalty from the assignor of the note because the assignor never took any interest at all. (*Id.* at p. 255.) In *Clarke v. Horany* (1963) 212 Cal.App.2d 307, 310–311 [27 Cal.Rptr. 901], the defendants had not received any payments from the plaintiff and, therefore, they could not be liable.

While we have no trouble agreeing with the proposition that one must have actually received an interest payment in order to be charged with paying it back, we reject the notion that a borrower cannot recover absent a finding that the recipient actually received more than the legal maximum. Such a holding would nullify the law. Lenders could easily charge interest plus fees that exceed the constitutional maximum but avoid liability for usury by directing that payments be made to different persons. (Cf. *Calimpco, Inc. v. Warden, supra,* 100 Cal.App.2d at p. 447.) If there is a basis for holding those different persons liable for usury, the borrower should be entitled to recoup his or her interest payments from them.

Investors also rely upon *Nuckolls v. Bank of California, supra,* 10 Cal.2d 278, but that case is distinguishable as well. In *Nuckolls,* the plaintiff was the holder of promissory notes she had received in connection with her divorce from Marshall Nuckolls. The notes, by their terms, were not usurious. (*Id.* at pp. 283–284.) Notwithstanding the plaintiff's receipt of the notes, Marshall continued to service the loans and, in so doing, extracted interest upon interest, which made the loans usurious. (*Id.* at p. 285.) The appellate court held that the plaintiff was entitled to enforce the notes as written because she was a holder in due course. (*Ibid.*) The court rejected the argument that, because Marshall was acting as her agent in demanding usurious interest, the interest provisions were void as to the plaintiff. The court found no evidence that the plaintiff knew about or ever received *any* of the interest Marshall had extracted. The court concluded, "[T]he act of her agent in collecting usurious interest without her knowledge or consent did not render the transaction usurious as to [the plaintiff] where no part of such usurious interest was received by her." (*Id.* at pp. 286–287.) The interest provisions remained valid. (*Id.* at pp. 283, 288.) The present case is different because the interest terms are void, Investors are not holders in due course, and Investors actually received interest payments.

## C. *Intent*

Investors maintain that they cannot be liable because they never intended to break the law. There is certainly no evidence that Investors intended to evade the law or that they had any reason to suspect JWA was not licensed. But the element of intent in usury is, as our Supreme Court has explained, "narrow." (*Ghirardo, supra,* 8 Cal.4th at p. 798.) "The essential elements of usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." (*Ibid.*) That willful intent " 'does not require a conscious attempt, with knowledge of the law, to evade it. The conscious and voluntary taking of more than the legal

rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete.' " (*Ibid.*, quoting *Thomas v. Hunt Mfg. Corp.* (1954) 42 Cal.2d 734, 740 [269 P.2d 12].)

Intent takes on greater significance when the question is whether the transaction is one to which the usury law applies. (*Ghirardo, supra*, 8 Cal.4th at p. 799.) But there is no dispute that the instant transactions were loan transactions and, therefore, that they are subject to the usury law. "When the transaction violates the usury law the intent of neither of the parties is material." (*Maze v. Sycamore Homes, Inc.* (1964) 230 Cal.App.2d 746, 750 [41 Cal.Rptr. 338].)

## IV. *Plaintiffs' Appeal—Failure to Award Treble Damages*

West's Civil Code section 1916-3, subdivision (a) provides, in pertinent part, "Every person . . . who for any loan . . . shall have paid or delivered any greater sum or value than is allowed to be received under the preceding sections . . . , may . . . recover in an action at law against the person . . . who shall have taken or received the same . . . treble the amount of the money so paid . . . , providing such action shall be brought within one year after such payment or delivery." This civil penalty is left to the discretion of the trial court. (*Burr v. Capital Reserve Corp.* (1969) 71 Cal.2d 983, 994 [80 Cal.Rptr. 345, 458 P.2d 185].) The trial court declined to award the penalty, finding that Ward and Lee had been "careless" or "mistaken" in their belief that the company was licensed. Plaintiffs argue that the ruling was error because the administrative law judge (ALJ) in the DRE proceedings found that "The acts and omissions by [Ward] must be inferred to have been the product of a deliberate and stealth-like scheme to create confusion within the [DRE] and in the mortgage brokerage industry." According to plaintiffs, the finding estops JWA from relitigating the issue of whether the licensing problem was a mistake, and, therefore, that the trial court abused its discretion in refusing to award treble damages. We reject the argument.

"Collateral estoppel precludes the relitigation of an issue only if (1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding is final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding." (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82 [70 Cal.Rptr.3d 817].) The doctrine is inapplicable here because the "finding" plaintiffs cite was not necessary to the ALJ's decision.

 " 'In order for the determination of an issue to be given preclusive effect, it must have been necessary to a judgment. This requirement "prevent[s] the incidental or collateral determination of a nonessential issue from precluding reconsideration of that issue in later litigation." [Citation.] The requirement "is necessary in the name of procedural fairness, if not due process itself, so that parties to litigation have sufficient notice and incentive to litigate matters in earlier proceedings which may bind them in subsequent matters." ' " (*McMillin Development, Inc. v. Home Buyers Warranty* (1998) 68 Cal.App.4th 896, 906–907 [80 Cal.Rptr.2d 611], quoting *Sandberg v. Virginia Bankshares, Inc.* (4th Cir. 1992) 979 F.2d 332, 346.) "[A] particular danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation. [Citations.] Such cases require close examination to determine whether nonmutual use of the doctrine is fair and appropriate." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 829–830 [88 Cal.Rptr.2d 366, 982 P.2d 229].)

In the present case, the statement upon which plaintiffs rely was not essential to the ALJ's determination of the issue in the administrative proceedings. There, the issue was whether Ward should be subject to discipline in connection with his real estate broker's license. Following the hearing, the ALJ issued a 41-page proposed decision containing 70 separately numbered findings of fact. None of the 70 findings includes the language plaintiffs quote. The ALJ's legal conclusions were that Ward breached his nondelegable duties as a licensee and "must bear full responsibility for the acts and omissions of agents or employees of [JWA], an unlicensed real estate corporation for which [Ward] assumed the role of licensed designated officer-broker." The ALJ further concluded that such a breach was cause for revocation of Ward's license. The quoted language came as a written response to Ward's questioning why the DRE had pursued the case with "such fervor." The ALJ's legal conclusions preceded the remark and did not turn upon it.

Furthermore, given the vastly different contexts of the two cases—the first concerning Ward's conduct in supervising JWA employees and the second concerning JWA's negotiation of loans with plaintiffs—it would be unfair to apply the collateral estoppel doctrine. JWA would have had no notice that the ALJ's comment could establish JWA's liability for a discretionary penalty in a separate case raising completely different issues. And, absent application of the collateral estoppel doctrine, the ALJ's factual findings are not binding upon the trial court in a different case. (*Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 148 [14 Cal.Rptr.3d 109].) Accordingly the trial court did not abuse its discretion in rejecting plaintiffs' collateral estoppel argument and deciding the issue of treble damages based upon the trial court's assessment of the evidence in this case.

### V. *Attorney Fees*

On appeal, JWA challenges the attorney fees order in favor of plaintiffs and plaintiffs challenge the attorney fees order in favor of Investors. We need not consider either argument. Because we reverse the judgment, the attorney fees awards fall as well. (*Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].) The trial court may redetermine the attorney fees motions following conclusion of the proceedings below.

### VI. *Conclusion*

To recapitulate, we hold:

(1) The trial court did not err in finding that the loans were made or arranged by JWA, which was not a licensed broker. Accordingly, the trial court correctly found in favor of plaintiffs and against JWA on the usury causes of action.

(2) The evidence is insufficient to support plaintiffs' causes of action for fraud and negligent misrepresentation against JWA.

(3) The trial court erred in finding Investors were not liable for usury because they are holders in due course. Furthermore, neither the amount of interest Investors received nor the lack of evidence of their bad faith is a defense to the usury causes of action.

(4) The trial court did not abuse its discretion in refusing to award treble damages.

### VII. *Disposition*

The judgment is reversed. The trial court is directed to:

(1) Enter judgment in favor of defendant Jim Ward & Associates, a California Corporation on the fraud and negligent misrepresentation causes of action;

(2) Find, on the evidence presented at trial, the liability of individual defendants Mahmud Assar et al., on the usury causes of action and enter judgment accordingly;

(3) Enter the remainder of the judgment in accordance with the court's prior determinations that are unaffected by this appeal;

(4) Entertain renewed motions for attorney fees.

The parties shall bear their own costs on appeal.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied June 28, 2011, and the petition of appellant Jim Ward & Associates for review by the Supreme Court was denied August 10, 2011, S194641.