Filed 3/18/13  Gates v. Coureen CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREGORY J. GATES, | H038069 |
| Plaintiff and Respondent, | (San Benito County Super. Ct. No. CU-10-00074) |
| v. | |
| CASEY COURNEEN, et. al., | |
| Defendants and Appellants. | |

After a court trial, plaintiff Gregory Gates obtained a judgment against defendants Kathleen Maki and Casey Courneen, the trustee of a revocable trust created by Michael Dennehy before his death.  The court awarded plaintiff damages on his contract and tort claims, which arose from a series of loans he had made to Dennehy, and rejected Courneen's cross-complaint for usury.  On appeal, defendants assert error in the trial court's determination that they were estopped from claiming usury as an affirmative defense and cross-complaint.  They further contend that the court misapplied the "tort of another" doctrine in awarding plaintiff attorney fees against Maki.  We find no error and therefore affirm the judgment.

*Background*

Plaintiff was a physician who had made a few loans in the past before being approached by Maki in 1994.  Maki identified herself as a mortgage broker, the branch

manager of American Capital Mortgage.[1]   Maki explained that she was "working with" a dentist, Michael Dennehy, who wanted to borrow against a few properties he owned in order to develop more real estate.   During meetings about the proposed transaction, Maki explained to plaintiff that his loan would be in second position.  Plaintiff believed that loans in second position usually commanded an interest rate of 14 to 15 percent, so he indicated that he would want 14 percent.   Maki told plaintiff that she would prepare the paperwork for the transaction.

Plaintiff made his first loan to Michael and Valerie Dennehy in August 1994 for $125,000, secured by a deed of trust for Dennehy's property at 930 San Benito Street in Hollister.  A few months later Maki arranged another loan from plaintiff to the Dennehys, this time for $100,000, secured by a deed of trust on the same property, though it listed a different Assessor's Parcel Number (APN).  This document was executed on October 4, 1994, but it was not recorded until January 1995.  Maki testified that she prepared the deed of trust on this second loan.  There was supposed to be additional collateral at 889 Sunset Drive; but that was not reflected on the second deed of trust.   She also admitted that she typed the wrong APN on this document.   Consequently, plaintiff mistakenly believed that he now had two properties as collateral for his loans.

During neither of these transactions did Maki disclose to plaintiff that she was not licensed by the Department of Real Estate to arrange loans between private parties.   She also did not reveal that she was not arranging these loans as part of her employment with American Capital Mortgage.   Her apparent connection with the mortgage company was important to him.  He believed that Maki was protecting his interests by "[t]he way she presented herself.  The fact that she had an office with a corporate name and that she

---

[1] Maki's business card identified her as a "Mortgage Banker" and "Regional Manager" of American Capital Mortgage.  Plaintiff testified that when he met Maki, he did not know the difference between a mortgage banker and a mortgage broker; he thought they were synonymous.

seemed professional . . . . She had acted like we could be very good partners in this kind of a loan."

In fact, Maki was not licensed as either a mortgage broker or a real estate broker, and therefore was not authorized to arrange loans; she was not licensed even as a real estate salesperson until October 27, 1994, after the execution of the second deed of trust.[2] And she testified at trial that she was *not* working "under the capacity of" American Capital Mortgage, but instead was acting under the direction of Dennehy, performing (she insisted) only a "clerical function." Had plaintiff known these facts, he would not have made these loans. He did not learn that Maki was unlicensed until after he filed this lawsuit.

In early July of 1995 Maki left American Capital Mortgage and began work as a loan officer for Corporate America Lending, which had a branch office in the building owned by Dennehy at 930 San Benito Street in Hollister. Maki told plaintiff about the new employer, and he marked the business card she had given him with the change.

Toward the end of 1995 Dennehy asked Maki to assist him with a third transaction between him and plaintiff. Dennehy wanted to extend the original loan for another five years, and Maki prepared a 14-percent, interest-only note for $225,000 due by May 1, 2001. Accompanying the note was a deed of trust and a letter by Dennehy professing an agreement that the "additional collateral" for the entire debt was 889 A Sunset Drive in Hollister, secured by a deed of trust in second position. In discussions with plaintiff before execution of the documents, Maki indicated that she was working as a "dual agent" for him and Dennehy, and that she was handling all of the paperwork for Dennehy's property and plaintiff's loans. Maki told him that he would "end up with two

_____

[2] Maki applied for a salesperson license on October 1, 1994, three days before the second loan to Dennehy. In signing the application, she certified that if licensed she would not "violate any provisions of the Real Estate Law nor abuse the privileges of a real estate license . . . ."

properties" as security for the $225,000 loan, and his reading of Dennehy's letter supported that conclusion.[3]  Maki took plaintiff to see the 889 Sunset Drive property, the building housing Dennehy's dental practice, which was to be his "extra collateral." Plaintiff trusted Maki.  She did not tell him that while Corporate America Lending was licensed to arrange mortgage loans, she was not registered as a licensee for that employer. That fact would have been important to him, as he "felt that [he] needed to be working with a licensed broker."

All three documents were dated January 1, 1996, but the deed of trust was not recorded until August 23, 1996.  Maki knew that plaintiff always wanted to be in second position; she was not aware that Dennehy had already placed his good friend Peter Courneen in second position in a loan secured by the same property; that deed of trust was dated December 15, 1995 and recorded on January 3, 1996.  Plaintiff did not learn that his deed of trust had been in third position until he filed this lawsuit.

Although Maki had her conditional salesperson license at the time, she nonetheless insisted at trial that she was preparing the documents for Dennehy in a "clerical" capacity which did not require a license.  She was at that time employed by him to manage his real estate investments.   It was not until 2000 that Maki and Dennehy began a romantic relationship.  From the end of that year until Dennehy's death Maki lived with Dennehy and continued assisting him in obtaining loans from plaintiff and other investors.

---

[3]  Dennehy's January 1, 1996 letter, which he typed himself, stated:  "It is agreed upon under the terms of our loan agreement that the deed of trust that is securing 889 A Sunset Drive, is for the additional collateral required by the beneficiary Gregory J. Gates in the amount of $125,000.00[.]  We have agreed to record the deed of trust for an amount of $225,000.00 which represents the total encumbrance per Gregory J. Gates request for documentation purposes only.  [¶]  The deed of trust will be secured in a second trust deed position."

4

On August 14, 1996, plaintiff signed a deed of reconveyance pertaining to the October 1994 transaction.[4] This document, recorded on August 23, 1996 (the same day as the recording of the January 1, 1996 deed of trust), established the Sunset Drive property as plaintiff's only collateral. At trial Maki could not remember whether she helped prepare the deed of reconveyance. Four months earlier her real estate salesperson license had been suspended for failure to complete educational requirements.

On August 1, 1998, Michael and Valerie Dennehy signed a new document intended to modify the loan agreement. Before the transaction Maki told plaintiff that Dennehy wanted to lower the interest rate on the $225,000; plaintiff agreed, and the new rate was reduced to 12.5 percent payable over five years.

In September 1999, Maki asked plaintiff if he would contribute another $30,000 to the loan amount. Plaintiff agreed, and the 1998 modification agreement was amended to reflect an increase in the principal to $255,000. Maki prepared both the 1998 and the 1999 modification agreements. She did not tell plaintiff that her license had been suspended or that his security was in third position behind Courneen's; had plaintiff known this, he would have behaved differently with regard to the transaction.

In February 2001 Maki began work in a sales position as a loan officer for Jack Kirk of Community West Mortgage, a branch of Mortgage Banking Corporation. Kirk explained to Maki that the office never handled commercial loans or loans between private parties. The property at 889 Sunset Drive was a commercial building which housed Dennehy's dental practice.

Toward the end of 2005, Maki asked plaintiff if he would extend the loan an extra 10 years, contribute an additional $45,000, and drop the interest rate to 11 percent. Maki described the proposed transaction as "a win-win-situation," because the Sunset Drive

_____

[4] The August 1994 deed of trust had been reconveyed in a document recorded in May 1995.

5

property's value had increased and the first mortgage was being paid down. She told plaintiff that Dennehy was no longer a married man, so the deed of trust would have to be registered in the name of his trust, without his wife. Plaintiff agreed to the additional $45,000; he understood from Maki that the paperwork would be done for him, and he trusted her. He was given "many, many reassurances" that this was only a modification of the existing loan, which would retain his second position on the Sunset Drive property.

Maki gave plaintiff a deed of trust and a $300,000 promissory note reflecting the new terms. Both documents, which Maki had prepared, were dated February 1, 2006. The deed of trust, however, was never recorded—indeed, Maki never intended to record it[5]-- and it described the property as 940 San Benito Street, not 889 Sunset Drive. Plaintiff was unaware of these facts. He did notice that the promissory note was unsigned, but Maki assured him "that that was going to be taken care of later, and that that wouldn't be a problem."[6]

The property at 940 San Benito Street was already subject to a $455,000 first deed of trust granted through Tedrowe Realty Investments (Tedrowe Realty), a loan broker, and recorded June 28, 2005.[7] The beneficiary listed on the deed of trust was "John M. Hiss and Nancy E. Katz, Trustees of the John M. Hiss and Nancy E. Katz 1998 Family Trust" (the "Hiss/Katz trust"). Lea Tedrowe testified that in arranging all of the approximately 20 loans to Dennehy, she always dealt with Maki, who had told Tedrowe

---

[5] Maki testified that Dennehy told her he would record these documents himself; he did not explain why he was not assigning that clerical task to her or another of his employees.

[6] It was not until a few weeks before her testimony that Maki found a signed copy of the note and the unrecorded deed of trust.

[7] On Dennehy's loan application, which Maki filled out for him, she did not list an unrecorded deed of trust in favor of the Bosler Family Trust for $170,000. Tedrowe testified that the $455,000 loan was "supposed to be" secured by a *first* deed of trust on the property, following the payoff of an existing $375,000 loan. The title investigation did not reveal the Bosler loan.

that she was "in loans" for a living. Tedrowe recalled that Maki received a fee for her services in these transactions.

On October 25, 2005, while employed at Community West Mortgage,[8] Maki filled out an application on Dennehy's behalf for a $500,000 loan, which was submitted to Lea Tedrowe. Maki signed as "interviewer" and used a stamp to list Community West Mortgage as her employer. This act was unauthorized, however, as the loan did not involve Community West Mortgage; as Jack Kirk reiterated, 889 Sunset Drive was a commercial property, and "we don't do commercial loans." In filling out the application, Maki omitted the 1999 $255,000 loan from plaintiff as well as the unrecorded $170,000 Bosler deed of trust and two loans totaling $75,000, which she had also arranged, from Thomas Johnson to Dennehy.[9]

Because Tedrowe wanted this loan to be in second position, Maki had to obtain plaintiff's reconveyance of the January 1, 1996 deed of trust. Plaintiff signed that document on January 24, 2006,[10] and on February 1, 2006—the same day plaintiff increased his own loan by $45,000 to $300,000-- the $500,000 deed of trust was recorded. Two lenders were listed on this document: Tedrowe as trustee of her trust and John Hiss, the current trustee of the Hiss/Katz trust. The interest rate on the $500,000 Tedrowe/Hiss loan was 11.25 percent and was in second position after other existing loans and a federal tax lien were paid off. Maki received a commission or fee of

---

[8] Jack Kirk testified that Maki worked for Community West Mortgage between February 15, 2001 and October 26, 2004. She returned to the office October 1, 2005 and worked there through December 18, 2007.

[9] Each of the notes on these two loans, which Johnson understood to be secured by a cottage in Carmel, stated that it was secured by "a certain DEED OF TRUST." Johnson, however, testified that he never saw a deed of trust for either loan.

[10] Although the "Substitution of Trustee and Full Reconveyance" is dated January 24, 2006, it was not recorded until March 9, 2007.

$6,250, the same amount received by Tedrowe Realty as broker. The Dennehy trust realized $302,845.66 in cash from the transaction. Maki testified that she did not know about that money, but the trial judge did not believe her; "given their relationship, that seems much too hard to believe." Plaintiff was unaware of this transaction altogether; consequently, he never knew that he would lose what he thought was his second position on Sunset Drive.

The 940 San Benito property was the security for a subsequent loan obtained from the Hiss/Katz trust through Tedrowe Realty for $205,000 at 11.25 percent. The second deed of trust on this transaction was recorded December 29, 2006. Lea Tedrowe testified that she never saw the note or deed of trust for plaintiff's $300,000 loan on the 940 San Benito property. The application form signed by Dennehy listed the $455,000 loan, but neither Maki nor Dennehy mentioned plaintiff's $300,000 loan, either orally or on the application. They also did not disclose the November 2005 loan from the Bosler trust on the same property, the Johnson obligation, or a $265,000 note on a July 2003 loan by Jeffrey Jensen.[11]

Plaintiff testified that he received regular payments from Dennehy until about three months before Dennehy's death on May 5, 2009.[12] In August of that year, the

_____

[11] The Jensen loan was secured by Dennehy's house on Hillside Road in San Juan Bautista. Jensen made at least six loans to Dennehy or his trust; Maki was involved in every one, but she did not inform Jensen that she was not licensed to arrange loans. Jensen was never informed that a first deed of trust was recorded on the same property two years later (in July 2005), for a loan of $550,000 with a maximum aggregate of $687,500. That same month, also unbeknownst to Jensen, a second deed of trust was recorded for $155,000 on the Hillside Road property. Jensen received payments regularly until Dennehy's death. The deed of trust on his loan was never recorded.

[12] When plaintiff asked Maki about the delay in payment, she assured him that they were undergoing a refinancing arrangement and he would receive his checks "shortly." In May she called to tell him that Dennehy had committed suicide. She was the executor of Dennehy's estate and that Capital Management Group (CMG), the apparent source of

trustee of Dennehy's trust, Casey Courneen, paid plaintiff for the February-August 2009 installments, and in November he paid plaintiff for the September-November installments. Plaintiff received no payments after that.

Courneen testified that he made similar "[c]atch-up payments" to other creditors, according to directions from Maki about whom to pay.[13] Once the trust ran out of money he stopped responding to creditors.[14]

Plaintiff filed this action on April 7, 2010, about five months after the date of the last check from Courneen. His third amended complaint, the operative pleading at trial, named as defendants Courneen, as trustee of Dennehy's trust; Maki; and two beneficiaries of the trust, Dennehy's son (Robert Dennehy) and his mother (Helen Dennehy). Plaintiff sought specific performance of the agreement to pay him $300,000 under the February 1, 2006 note; cancellation of the two reconveyances of the deeds of trust (August 14, 1996 and January 24, 2006); declaratory relief; and damages for misrepresentation and negligence.

On April 26, 2011, the same day the third amended complaint was filed, Courneen filed a cross-complaint against Gates to recover the "usurious" interest Gates had

the checks, "was herself." Maki had been granted CMG under the terms of Dennehy's primary trust.

[13] Maki, however, stated that while she was the only trustee of the dental practice trust, she had received no money from the dental practice. She explained that CMG, which she now owned, had been selected to receive rental payments, which would eventually be distributed to the trust, not to her. Some rent had been collected from real estate holdings, but there were assignments of rents applicable to some of the properties. She had paid the Tedrowe mortgages from money the CMG had collected from the life insurance trust and the dental practice. But she paid only the creditors authorized by Courneen, which did not include those with unrecorded deeds of trust.

[14] Courneen had intended to make additional payments from a 2009 revocable life insurance trust, but by the time of trial he had not yet received the assets from Maki to enable him to take control of that trust.

9

received from the trust during the preceding two years ($52,250), and for treble damages for the amounts Gates had received within the preceding year ($27,500).   (See Civ. Code, § 1916.12-3.)   Plaintiff's third amended complaint anticipated these allegations, as they had also been made in Courneen's affirmative defense in answer to plaintiff's second amended complaint.  The description of the fraud damages in the third amended complaint thus included the attorney fees plaintiff expected to incur from having to defend Courneen's allegations of usury.

The parties waived a jury and stipulated to a bifurcation of the issue of whether plaintiff was entitled to attorney fees as additional damages against Maki under the "tort of another" doctrine.   The court heard testimony over three days in July 2011.  During closing arguments, plaintiff withdrew the first two causes of action (specific performance and cancellation of reconveyances).  On August 1, 2011, the court orally announced its verdict for plaintiff on the remaining three causes of action.  The court noted that "a common thread" in the testimony from investors (presumably Thompson and Jensen in addition to plaintiff) was their belief that Maki was either a mortgage broker or banker; and even Lea Tedrowe, herself a mortgage broker, had believed that Maki was a loan "professional."   The court found Maki to be "evasive at times" and at times "hard to believe given her experience in working in the loan industry."   The court specifically discredited Maki's representations that she was "just a scribe or just a go[f]er for Dr. Dennehy," along with her assertion that she "wasn't involved, that she had no idea what Dr. Dennehy was doing."   The court also noted that Maki had realized the same compensation as Tedrowe's brokerage fee.  Based on its finding of a "continuing course of fraudulent conduct" by both Dennehy and Maki, the court awarded plaintiff the amount requested, $300,000 in principal plus $55,000 in interest and $3,135 in late fees.

The parties then turned to the bifurcated issue of attorney fees as additional damages against Maki.  Plaintiff claimed entitlement to those fees on the theory that a person injured by a real estate agent's fraud or negligence can recover attorney fees for

litigation incurred to prosecute or defend a lawsuit involving a third party. Plaintiff's counsel calculated the amounts charged to plaintiff for only the litigation with the Dennehy trust, not the fees that were "solely attributable to pursuing the professional liability claims against Ms. Maki." Accordingly, plaintiff asked for $44,125 from Maki under the "tort of another" doctrine.

After a series of written arguments, the court granted plaintiff's request, but only for the portion of the fees he had incurred *after* the cross-complaint was filed on April 26, 2011. It was at that point, the court reasoned, that plaintiff's focus and efforts shifted from establishing the liability of the Dennehy trust to proving the fraud or negligence of Maki in response to the cross-complaint. The court therefore awarded plaintiff attorney fees as additional damages of $28,300.

Acceding to a defense request, the trial court filed a statement of decision on January 17, 2012. It highlighted its finding that Maki was not credible in her attempt "to portray her role as solely clerical and relaying messages," and it restated its conclusion that Maki and Dennehy had engaged in a continuing course of fraudulent conduct from 1994 through 2006. In the court's view, "[t]he fraud involved Ms. Maki leading Dr. Gates to believe she was acting in the role of a licensed mortgage professional in arranging the loan transactions. Additionally, there were false representations and non-disclosures of matters independent of Ms. Maki's licensure, including Dr. Gates being lead [*sic*] to believe 1) that he would be receiving two pieces of collateral in 1994 when he [received only] one, 2) that his loan would be placed in a second position on 889 Sunset Drive in late 1995 when, just days earlier, Dr. Dennehy [had] placed a loan from Peter Courneen in second position, and 3) that in 2006 his $300,000[.]00 loan would be in second position on the Sunset Drive property when Dr. Dennehy and Ms. Maki were arranging for another $500,000.00 loan to be placed in second position on the property through Tedrowe." Plaintiff, the court found, had reasonably relied on each of the misrepresentations Maki had made, and he was damaged by releasing the deed of trust

11

encumbering the Sunset Drive property in 2006, substituting the trust in place of the Dennehys as obligors on the $255,000 loan, and loaning an additional $45,000 to the trust. Because the $500,000 Tedrowe loan, not his, was in second position, he was left with no equity from which to recover his money when the trust stopped paying him in 2009. The release of his deed of trust meant that nonjudicial foreclosure was unavailable as a remedy.

The court further found Maki to have been negligent by failing to record the deed of trust on the $300,000 loan. As a result, plaintiff not only lost his $300,000 but had to defend against the usury cross-complaint brought by the trust.

The court considered and rejected a number of affirmative defenses defendants had asserted in answering the third amended complaint.[15] Of those, only usury is at issue on appeal. Addressing that allegation, the court again ruled against defendants. Regarding the affirmative defense, Maki was not entitled to claim usury, as she was not the borrower. As to the trust, the court applied the rule that a borrower who fraudulently induces a lender into making a loan is estopped from protection under the usury laws. (See, e.g., *Baker v. Butcher* (1930) 106 Cal.App. 358.)

In the judgment filed contemporaneously with the statement of decision, the court awarded plaintiff $300,000 against Courneen as trustee and Maki, jointly and severally, plus $2,915 per month from December 1, 2009 through that day, January 17, 2012. The judgment also included the $28,300 that Maki had been ordered to pay as additional damages under the "tort of another" doctrine. Defendants filed this timely appeal.

*Discussion*

Defendants' contentions on appeal depend primarily on the underlying assertion that the interest rate on plaintiff's loans was usurious as a matter of law. Usury is

---

[15] The appellate record does not contain defendants' answer to this pleading.

12

controlled by article XV, section 1 of the California Constitution, which sets the maximum rate for a loan at 10 percent when the loan is to be used for "personal, family, or household purposes," and the higher of 10 percent or a figure commensurate with the discount rate set by the Federal Reserve Bank.[16] The parties debate the proper measure of the maximum allowable rate. Defendants refer to the rate applicable in 1994, while plaintiff maintains that it is the rate effective in 2006, when the final $300,000 loan was made to the trust, that is applicable here. Plaintiff further argues that even the 1994 discount rate was not established at trial; hence, there was insufficient evidence of usurious interest presented to the trial court—or, for that matter, to this court.[17] Plaintiff also challenges the factual premise that the 2006 loan was for personal, family, or household purposes, which would have made 10 percent the maximum rate allowed under paragraph (1) of article XV, section 1. On the contrary, he suggests, "the money was most likely used for Dr. Dennehy's real estate investment activities."

---

[16] As to these loans, section 1 of article XV states: "(2) For any loan or forbearance of any money, goods, or things in action for any use other than specified in paragraph (1), at a rate not exceeding the higher of (a) 10 percent per annum or (b) 5 percent per annum plus the rate prevailing on the 25th day of the month preceding the earlier of (i) the date of execution of the contract to make the loan or forbearance, or (ii) the date of making the loan or forbearance established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act as now in effect or hereafter from time to time amended (or if there is no such single determinable rate of advances, the closest counterpart of such rate as shall be designated by the Superintendent of Banks of the State of California unless some other person or agency is delegated such authority by the Legislature)."

[17] Plaintiff objects to defendants' citation of a website as support for their assertion on appeal that in 1994 the Federal Reserve Bank's discount rate was 3.5 percent. Defendants have separately asked this court to take judicial notice of that site, on which the Federal Reserve Bank of San Francisco lists the discount rates during the loan periods. Defendants reason that this information would establish that the interest rates on those loans were usurious. The motion is denied.

We need not enter this debate. As plaintiff points out, the trial court's ruling did not rest on evidence of the interest rate applicable to any of plaintiff's loans; it relied entirely on the doctrine of estoppel to bar defendants' reliance on usury to avoid liability on plaintiff's causes of action. We will examine that rationale for the court's judgment. If Maki or Dennehy fraudulently induced plaintiff to make these loans, Courneen may be estopped from claiming usury, whether or not the interest rate was in fact excessive under the law.[18]

*1. Application of Estoppel to Usury Allegations*

In finding estoppel applicable the trial court cited the rule that a borrower who fraudulently induces a lender into making a loan may be barred from asserting usury to avoid liability. In *Baker v. Butcher*, *supra*, 106 Cal.App. at pages 364-365, the plaintiff borrowers, having assured the purchaser of the note that the rate was legal, were estopped to claim usury against the purchaser. The appellate court reasoned, "To permit the plaintiffs to now deny the validity of this note or assert that they did not receive the full face value of the note from the payee, would sanction a fraud and convert the wholesome purpose of the usury law into an engine of injustice and deceit. This may not be done." (*Id*. at pp. 364-365; see also *White v. Seitzman* (1964) 230 Cal.App.2d 756, 761 [where borrower was the "guiding hand" in usurious transaction and was seeking "furtively to evade" the usury law, court would not promote "deliberate fraud" and a "mockery of the law" by allowing him to recover treble damages under that very law]); *Buck v. Dahlgren* (1972) 23 Cal.App.3d 779, 789 [borrower was estopped from recovering both treble damages and usurious interest paid, where he took the initiative in seeking the loan, suggested payment terms and conditions, and misrepresented to the inexperienced lender his intention to repay the loan and the value of the security].)

---

[18] As noted earlier, the trial judge observed that Maki had no standing to claim usury in any event, as she was not the borrower.

In reviewing the trial court's finding of estoppel in these circumstances, we adhere to the appropriate standard of review. The court's dispositive finding, that plaintiff was induced to make the series of loans and execute deeds of reconveyance through the fraudulent conduct of Dennehy and Maki, is a factual determination that is subject to a review for substantial evidence on appeal. Accordingly, "[o]ur task on appeal is merely to view all factual matters in favor of the prevailing party and in support of the judgment, disregarding evidence to the contrary, and decide whether there is any substantial evidence, contradicted or uncontradicted, to support the findings and conclusions of the trier of fact." (*Del Mar v. Caspe* (1990) 222 Cal.App.3d 1316, 1324; accord, *Creative Ventures, LLC v. Jim Ward & Associates* (2011) 195 Cal.App.4th 1430, 1443.) "If there is any substantial evidence or any reasonable inference from the evidence to support the findings, the appellate court cannot substitute its judgment for that of the trial court." (*Janisse v. Winston Inv. Co.* (1957) 154 Cal.App.2d 580, 582.)

Defendants contend that the trial court's finding that Dennehy and Maki acted fraudulently is unsupported by substantial evidence. Notably, defendants selectively dispute certain events while bypassing the abundant evidence of multiple misrepresentations and concealment by Dennehy and Maki. They assert in particular that no evidence supports the conclusion that either of the Dennehys or Courneen "made any representations whatsoever to Dr. Gates concerning the loans to Dr. Dennehy and his wife." The issues before the trial court, however, were not confined to the initial loan to Michael and Valerie Dennehy. Defendants further take issue with the finding that in lending money to Dennehy and (later) his trust, plaintiff relied on Maki's business card identifying her as a mortgage banker. No misrepresentation was alleged against Courneen, however, and Maki was accused of conduct that went far beyond giving plaintiff her business card.

The affirmative misrepresentations and concealment by Dennehy and Maki over the entire course of their relationship with plaintiff led plaintiff to believe (1) that he

15

would receive two properties as collateral rather than one; (2) that his 1996 loan on 889 Sunset Drive would be in second position (whereas instead, Courneen's loan was placed in second position); (3) that his 2006 loan would be in second position on the Sunset Drive property (whereas in fact it was a different property and Tedrowe Realty was in second position); (4) that the deed of trust on the 2006 loan would be properly recorded; and (5) that Maki was legally authorized to arrange these loans. We have no difficulty in upholding the trial court's factual findings on these points as supported by the testimony presented at trial.

Of course, as defendants point out, a lender cannot successfully assert estoppel merely because the borrower knew that the interest rate exceeded what was allowed by law but continued to make the payments. "[T]he borrower and lender are not *in pari delicto* in a usurious transaction, and . . . an estoppel does not arise simply because the borrower knew of the usurious nature of the transaction, took the initiative in seeking the loan, and paid usurious interest without protest." (*Janisse v. Winston Investment Co., supra,* 154 Cal.App.2d at p. 587; accord, *Teichner v. Klassman* (1966) 240 Cal.App.2d 514, 523; *McClung v. Saito* (1970) 4 Cal.App.3d 143, 153.) Here, however, Dennehy and Maki misled plaintiff (along with other investors) into making a series of loans culminating in plaintiff's $300,000 loan secured by no collateral at all; thus, having been induced to reconvey the deeds of trust on both properties he believed were his collateral, he was left with merely an unrecorded deed of trust pertaining to a different property. We therefore conclude that the court did not err in finding estoppel applicable to defendants' assertion of usury both as an affirmative defense to the complaint and in Courneen's cross-complaint. Plaintiff was properly awarded lost principal and interest on his loan, and Courneen (as trustee of the Dennehy trust) was not entitled to recovery of interest and treble damages based on usury.

16

## 2. *Attorney Fees as Damages under "Tort of Another" Doctrine*

Defendants further contest the order that Maki pay plaintiff $28,300 in attorney fees as additional damages attributable to the litigation of the fraud and negligence allegations, which became necessary once defendants claimed usury. Defendants argue that the "tort of another doctrine" is applicable only in exceptional circumstances, which were not present here. We reject both the premise and the conclusion.

The "tort of another" or "third party tort" doctrine is an exception to the general rule that parties to a lawsuit bear their own attorney fees. (Code Civ. Proc., § 1021.) As the Supreme Court has explained, "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618, 620.) In *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505 (*Gray*), the plaintiff buyer was permitted to recover his fees from the realtor for the realtor's negligence necessitating a suit against the sellers. The Supreme Court clearly approved of the application of the "tort of another" doctrine "when it has been found that the party seeking attorney fees was required by the wrong of the defendant to protect his interests by bringing or defending an action against a third person." (*Id.* at p. 508.) In elaborating on the *Prentice* definition the Supreme Court cited the Restatement Second of Torts, section 914, paragraph (2), which states: "(2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action." (Rest.2d Torts, § 914, p. 492.) The Restatement's comment on subsection (2) indicates that the tort of another rule "applies when the preceding action was brought against the present plaintiff either by a third person or by the state, and also when the present

17

plaintiff has been led by the defendant's tort to take legal proceedings against a third person." (Rest.2d Torts, § 914, com. b, p. 493; see *Gray, supra,* 35 Cal.3d at p. 505; [plaintiff buyer permitted to recover fees from realtor for negligence necessitating suit against sellers].)

Earlier, in *Davis v. Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6, the Supreme Court had commented that "*Prentice* limits its authorization of fee shifting to cases involving 'exceptional circumstances.' " But in *Gray*, the court appeared to dispense with such a requirement, noting that neither the Restatement nor other jurisdictions applying this exception impose such a showing on the party seeking the fees. (*Id*. at p. 509.) Subsequently the high court confirmed that it had "rejected the notion that recovery under [the third-party tort] theory required exceptional circumstances." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 818, fn. 4.)[19] The First District, Division 3, made the additional point that "the so-called 'third party tort exception' to the rule that parties bear their own attorney fees is not really an 'exception' at all but an application of the usual measure of tort damages. The theory of recovery is that the attorney fees are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action. In such cases there is no recovery of attorney fees qua attorney fees (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 817-818.) Indeed, this point was made clear in *Prentice* itself when the court stated it was 'not dealing with "the measure and mode of compensation of attorneys" but with damages wrongfully caused by the defendant's improper actions.' (*Prentice, supra*, 59 Cal.2d at p. 621.)" (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310.)

---

[19] Still, some courts have continued to invoke the "exceptional circumstances" requirement in discussing the "tort of another" doctrine. (See, e.g., *Conservatorship of Berry* (1989) 210 Cal.App.3d 706, 718.)

By any standard, the circumstances of this case plainly justify the application of the exception. Through Maki's negligence and fraud, plaintiff agreed to a series of transactions that, ironically, later became the subject of Courneen's usury allegations against him.

Maki protests that it was not her fault that plaintiff was forced to defend himself against the cross-complaint; instead, it was his own "mistaken belief that any interest rate charged by him to Dr. Dennehy would not be usurious as long as it was secured by a deed of trust, coupled with his belief that 14% per annum was a fair rate of interest for a loan secured by a second deed of trust, that resulted in the making of the usurious loans to Dr. Dennehy." The substance of this argument, however, plainly reveals its inadequacy. Defendants contend that "there is no evidence, substantial or otherwise, that Kathleen Maki did or said anything which negligently or fraudulently induced Dr. Gates to loan money to Dr. Dennehy commencing in August 1994, at the rate of 14% per annum. That interest rate was his decision, and his decision alone, and neither Kathleen Maki nor Dr. Dennehy had any input into that decision." In disregarding the court's factual findings and narrowly focusing on the interest rate, this argument misses the point. At the very least, Maki's failure to disclose her lack of a license, together with her misrepresentations, induced plaintiff to enter into these transactions, which ultimately led to his losses when the loan payments stopped. Whether Maki or Dennehy knew that the rate was usurious is immaterial. Likewise, it is not helpful to defendants to assert that plaintiff's "need to defend himself against the cross-complaint arises solely from his incorrect understanding of the usury law." Plaintiff's successful defense did not require proof of any party's misunderstanding about usury law, but relied on estoppel to defeat the usury allegations altogether.

Moreover, had Maki been a licensed broker as she purported to be, any excessive rates would have qualified for the statutory exemption from the limit defined in article XV, section 1 of the California Constitution. The exemption, set forth in Civil Code

19

section 1916.1, applies to loans arranged by a licensed real estate broker for compensation.[20] Notwithstanding defendants' characterization of the evidence on appeal, the record clearly supports the court's finding that Maki arranged this series of loans and that she received compensation for her efforts.[21] As to defendants' focus on the interest rate, the statute "does not require or indicate that the exemption applies only if the broker is somehow involved in determining the interest rate to be charged on a loan that he or she has solicited, negotiated, or arranged. Moreover, there is nothing implicit in the common understanding of these terms that would compel such a view." (*Del Mar v. Caspe, supra,* 222 Cal.App.3d at p. 1327.) Thus, had Maki been acting as a licensed

---

[20] Civil Code section 1916.1 states: "The restrictions upon rates of interest contained in Section 1 of Article XV of the California Constitution shall not apply to any loan or forbearance made or arranged by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property. For purposes of this section, a loan or forbearance is arranged by a person licensed as a real estate broker when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another, (2) acts for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business for another and (A) arranges a loan to pay all or any portion of the purchase price of, or of an improvement to, that property or business or (B) arranges a forbearance, extension, or refinancing of any loan in connection with that sale, purchase, lease, exchange of, or an improvement to, real property or a business, or (3) arranges or negotiates for another a forbearance, extension, or refinancing of any loan secured by real property in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business. The term "made or arranged" includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license."

[21] Maki testified that in connection with the first two loans she was compensated $10 an hour by Dennehy. For preparing the 1998 modification agreement reducing the interest rate from 14 to 12.5 percent, she received compensation as part of her employment by Dennehy. The trial court did not credit her insistence that she was performing only a clerical function.

broker it would have made no difference who set the rate of interest plaintiff was to receive in the initial 1994 loan. In any event, it was Maki, on Dennehy's behalf, who proposed to plaintiff the terms of the remaining transactions.

Defendants' reliance on *UMET Trust v. Santa Monica Medical Investment Co.* (1983) 140 Cal.App.3d 864, is misplaced. In that case the defendant borrower (SMMI) lost to the plaintiff, UMET, in the primary lawsuit. SMMI did succeed in its cross-complaint against UMET, but only insofar as its lease was reformed to a loan, and it obtained only nominal damages from its cross-complaint against the mortgage broker. The trial court denied SMMI's request for attorney fees as third-party tort damages against the broker. The appellate court affirmed, noting that "[t]he exceptional circumstances doctrine is not applied in cases where the party seeking reimbursement for counsel fees is not *compelled* or *required* to bring or defend an action against the third person." (*Id*. at p. 871.) SMMI had voluntarily entered into the transaction -- not because of the third party's conduct but because it "sorely needed" the funds, and its defense to the primary lawsuit brought by UMET was unsuccessful. (*Id*. at p. 872.) And it was SMMI, the borrower, "whose conduct in the first instance engendered the primary lawsuit in respect of which the general damages and counsel fees were incurred." (*Ibid*.) Consequently, SMMI was not entitled to reimbursement under the third-party tort doctrine.

Clearly UMET has no application to the instant case, where *Maki's* tortious conduct "compelled" plaintiff to incur attorney fees to defend himself against Courneen's cross-complaint. Because Maki's fraud and negligence had to be litigated in order to defeat Courneen's cross-complaint, the trial court properly determined that plaintiff was entitled to recover from Maki additional damages attributable to the attorney fees he incurred in that defense.

### *Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.

22